## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WALTER OGROD

               Plaintiff,

    v.

CITY OF PHILADELPHIA, and
DETECTIVE MARTIN DEVLIN,
DETECTIVE PAUL WORRELL,
DETECTIVE EDWARD ROCKS,
SERGEANT ROBERT SNYDER,
SERGEANT LAURENCE NODIFF,
LIEUTENANT JOSEPH WASHLICK
in their individual capacities

               Defendants.

CIVIL ACTION

NO. _____

**COMPLAINT**

Plaintiff, Walter Ogrod, by and through his attorneys, the Marrone Law Firm, LLC, hereby alleges as follows:

### INTRODUCTION

1.　　On June 5, 2020, 55-year old Walter Ogrod walked out of prison as a free man after spending 28 years, 1 month, and 30 days incarcerated, 23 years of which were on death row, for a crime he did not commit.

2.　　In order to secure a conviction of Mr. Ogrod for the July 12, 1988, murder of four-year-old Barbara Jean Horn, Defendants City of Philadelphia and the individual police officers named herein coerced and fabricated confessions, withheld exculpatory evidence, and engaged in other egregious conduct which they concealed from Mr. Ogrod, the Court, and the jury.

3.      Walter Ogrod is now a free man and no longer awaiting execution because evidence that was withheld at the time of his trial has now been revealed.  That evidence conclusively shows that:

    a.  Mr. Ogrod's confession made in police custody on April 5, 1992[1] was coerced and by no means voluntary;

    b.  A later jailhouse confession allegedly made while Ogrod was awaiting trial was also completely fabricated;

    c.  False evidence was used against Mr. Ogrod regarding Barbara Jean's cause of death;

    d.  False evidence was used regarding the alleged "murder weapon"; and

    e.  The individuals and institutions responsible for solving this crime were far more concerned with getting an arrest and conviction than with finding the truth about who killed Barbara Jean Horn.

4.      Knowing of his innocence, Walter Ogrod never stopped fighting to save his own life.  After exhausting all appeals, he made an application for relief under the Pennsylvania Post Conviction Relief Act (PCRA) in 2005. In 2018 his PCRA was assigned to the Conviction Integrity Unit of the District Attorney's Office (CIU), and a thorough investigation followed. Ogrod and the CIU eventually revealed evidence of the myriad illegal and unconstitutional improprieties that tainted the investigation and nearly cost Ogrod his life.  The evidence proved to be so overwhelming that in 2020 the District Attorney of Philadelphia joined the petitioned to

---

[1]      The confession made in police custody bears the date March 5, 1992, but at trial was described by investigating detectives as having occurred on April 5, 1992. The only explanation for the discrepancy is that the investigating detective simply wrote down the wrong date by mistake.

the Court of Common Pleas for Ogrod's release and ultimately requested that the Court *nolle prosse* all charges.

5.      Further, and as detailed herein, Mr. Ogrod's wrongful conviction was the direct result of the unconstitutional and improper policies, practices, and customs of the City of Philadelphia, including the Philadelphia Police Department, its Homicide Unit, and the previous administration of the Philadelphia District Attorney's Office, all of which, for a period starting as early as the 1970's and continuing through the investigation in this case and for years thereafter, evidenced deliberate indifference to practices of coerced confessions, fabrication of evidence, witness intimidation and coercion, suppression of exculpatory evidence, and abuse of authority.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. §1367(a).

8.      Venue properly lies in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 (b) in that this is the District in which the claims arose.

## JURY DEMAND

9.      Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

**PARTIES**

10.    Plaintiff, Walter Ogrod, is an adult male who was born in 1965 and was, at all times relevant to this Complaint, a resident of the Commonwealth of Pennsylvania.  He was arrested on April 6, 1992 and wrongly convicted of the murder of Barbara Jean Horn.  Mr. Ogrod was discharged from the custody of the Pennsylvania Department of Corrections on June 5, 2020 and five days later he was fully exonerated.  Mr. Ogrod currently resides in Philadelphia, Pennsylvania

11.    Defendant City of Philadelphia is a City of the First Class in the Commonwealth of Pennsylvania and at all times relevant hereto operated under the color of state law in creating and maintaining a Police Department and District Attorney's Office, was the employer of all individual Defendants, and was officially responsible for all policies, procedures, and practices of the Philadelphia Police Department (PPD) and the District Attorney's Office (DAO).

12.    Defendant, Martin Devlin, (hereinafter "Defendant Devlin") was, at all times relevant to this Complaint, an officer of the Philadelphia Police Department acting under color of law and within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the Philadelphia Police Department.  He is sued in his individual capacity.  Upon information and belief, Devlin was assigned as a detective with the Homicide Unit and/or the Special Investigations Unit at all relevant times.

13.    Defendant, Paul Worrell, (hereinafter "Defendant Worrell") was, at all times relevant to this Complaint, an officer of the Philadelphia Police Department acting under color of law and within the course and scope of his employment pursuant to the statutes, ordinances,

4

regulations, policies, customs, and usage of the City of Philadelphia and the Philadelphia Police Department.  He is sued in his individual capacity.  Upon information and belief, Defendant Worrell was assigned as a detective with the Homicide Unit and/or the Special Investigations Unit at all relevant times.

14.     Defendant, Edward Rocks, (hereinafter "Defendant Rocks") was, at all times relevant to this Complaint, an officer of the Philadelphia Police Department acting under color of law and within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the Philadelphia Police Department.  He is sued in his individual capacity.  Upon information and belief, Defendant Rocks was assigned as a detective with the Homicide Unit and/or the Special Investigations Unit at all relevant times.

15.     Defendant, Robert Snyder, (hereinafter "Defendant Snyder") was, at all times relevant to this Complaint, an officer of the Philadelphia Police Department acting under color of law and within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the Philadelphia Police Department.  He is sued in his individual capacity.  Upon information and belief, Defendant Snyder was assigned as a sergeant and supervisor with the Homicide Unit and/or the Special Investigations Unit at all relevant times.

16.     Defendant, Laurence Nodiff, (hereinafter "Defendant Nodiff") was, at all times relevant to this Complaint, an officer of the Philadelphia Police Department acting under color of law and within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the Philadelphia Police Department.  He is sued in his individual capacity.  Upon information and belief, Defendant

Nodiff was assigned as a sergeant and supervisor with the Homicide Unit and/or the Special Investigations Unit at all relevant times.

17.     Defendant, Joseph Washlick, (hereinafter "Defendant Washlick") was, at all times relevant to this Complaint, an officer of the Philadelphia Police Department acting under color of law and within the course and scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the Philadelphia Police Department.  He is sued in his individual capacity.  Upon information and belief, Defendant Washlick was assigned as a lieutenant and supervisor with the Homicide Unit and/or the Special Investigations Unit at all relevant times.

## FACTUAL ALLEGATIONS

## THE MURDER AND INITIAL INVESTIGATION

18.     On July 12, 1988 at 5:30 p.m., four-year-old Barbara Jean Horn was discovered by a neighbor dead inside a cardboard television box (the "box") at the curb, next to metal trash cans, in front of 1409 St. Vincent Street, Philadelphia - less than 1,000 feet from her home. Barbara Jean had open head wounds and bruises on her head, back, and shoulders.  Her body was naked, wet and partially covered by a plastic garbage bag.

19.     Police, the medical examiner, and the criminalistics laboratory collected biological matter from the box and the plastic bag that partially covered Barbara Jean's body.

20.     Barbara Jean's stepfather, John Fahy, was interviewed and he told police that he last saw her alive at the Fahy residence, 7245 Rutland Street, around 3:00 p.m. that same afternoon.

21.     Fahy told police he went to the home of two of Barbara Jean's friends, Anthony Adair and Charlie Green, Jr., looking for Barbara Jean.  Anthony Adair's father told Fahy that

Barbara Jean had been by earlier looking for Anthony, but that Fahy should check Charlie Jr.'s house because Charlie Jr. had also stopped by looking for Anthony.  When Fahy checked Charlie, Jr.'s house, his mother, Linda Green, said she last saw Barbara Jean around 2:00 p.m.

22.     Neighbor Raymond O'Brien told police that Barbara Jean stopped by his house around 2:30 p.m. to see if his daughter Megan was home, but left because Megan was not there.

23.     At least five different eyewitnesses, David Schectman, Michael Massi, and Christopher Kochan (the testifying eyewitnesses); and Lorraine Schectman and Peter Vargas (non-testifying eyewitnesses), told police they saw a man carrying and/or dragging the box through the neighborhood late in the afternoon of the murder.

24.     The testifying eyewitnesses described the man with the box as follows:

- White, 5'8"-5'9" tall, 25-30 years old, slightly tanned, dark blonde or dirty blonde hair, medium build, and wearing khaki shorts (David Schectman).

- White, 5'6"-5'8", medium build, hair "on darker side" and close to head, "30ish," darker complexion like "someone who had been out in the sun," and could not describe clothing (Michael Massi).

- White, brown hair, 5'8" tall, and low 30's in age (Christian Kochan).

25.     The non-testifying eyewitnesses described the man with the box as follows:

- White, 5'7"-5'8" tall, 20-25 years old, average build, tan but not dark tan, "light brown/dirty blond/wavy hair" and beige long pants (Lorraine Schectman).

- White, 5'9"-6' tall, 165-175 pounds, average build, brownish/blond hair, medium complexion, and blue jeans.  The man had a slight moustache and was smoking a cigarette (Peter Vargas).

26.     None of the testifying eyewitnesses indicated that they saw any blood on the man carrying the box.

27.     At the time of the murder, Walter Ogrod lived at 7244 Rutland Street, directly

across the street from the Fahy residence.  The Ogrod residence was a small row home consisting of two floors and a basement, measuring a total of 1088 square feet.  At that time, Walter shared his residence with Hal Vahey and four members of the Green family: Charles and Linda Green and their children Ingrid (13) and Charlie, Jr. (7).

28.     On the night of the murder, Officer Robert Patrick spoke with Linda Green and she told him that Fahy came to their residence at 3:00 p.m. looking for Barbara Jean.

29.     As part of a neighborhood survey, Officer Harmon interviewed Linda and Ingrid Green the day after the murder.  Ingrid said she went to Jardel Recreational Center at 1:00 p.m. with her little brother.  Linda told Officer Harmon that she saw Barbara Jean standing alone across the street around 2:00 p.m.

30.     Mr. Ogrod was interviewed by Officer Shields in a separate neighborhood canvas during which he told police that at 3:30 p.m. on the day of the murder, Fahy knocked on the door of the Ogrod residence and asked if he or others in the house had seen his daughter.

31.     Based on descriptions provided by the Schectmans, police artists drew a sketch of the suspect and posted it widely throughout the neighborhood.

32.     David Schectman subsequently made an in-person identification of Ross Felice, who lived nearby at 7061 Castor Avenue, as the man he had seen with the box, and also made a photo identification of another person, Raymond Sheehan.

33.     Kochan, despite telling police that he would probably not recognize the man with the box if he saw him again, was shown two separate photo arrays on two separate dates. Ultimately, Kochan "pointed" to a total of 4 photographs from the two separate photo arrays.

34.     Not one of the eyewitnesses ever identified Mr. Ogrod as the man carrying the box.

35.     The day after the murder, Philadelphia Assistant Medical Examiner Paul Hoyer

8

conducted an autopsy in which he identified bruises on Barbara Jean's back and lacerations and bruises to her head.

36.     During the autopsy, fingernail scrapings, oral, rectal, and vaginal swabs, as well as the wash used to clean Barbara Jean's body (and any material collected by the wash) were collected and preserved.

37.     In his autopsy report, Dr. Hoyer opined that the child had been killed between 3:30 and 4:30 p.m. on July 12, 1988 and the cause of death was cerebral injuries, which he defined as scalp lacerations and contusions, subarachnoid hemorrhage, focal superficial brain lacerations and contusions, and mild brain swelling.

38.     Sergeant Robert Snyder, who took notes during Dr. Hoyer's autopsy on July 13, 1988 noted the following:

- Autopsy disclosed five (5) blunt injuries to the head causing four (4) lacerations.

- Two (2) to back of the head.

- Two (2) to left side of the head.

- NO SKULL FRACTURE

- Cause of death Cerebral Injuries (HEAD INJURIES)

- Manner of Death Homicide.

- Bruise to left shoulder consistent with the head injuries.

- NO SEXUAL ABUSE

- NO OLD INJURIES

- Post mortem ant bites.

- Weapon: Probably a 2x2 or 2 x 4. Something lighter then [sic] a baseball bat or tire iron.

39.     Police were eventually able to trace the box to a Hitatchi television purchased on February 10, 1984, by Joseph Ward, who lived at 7208 Rutland Street, the same block as Barbara Jean.

40.     On July 21, 1988, homicide detectives obtained a search warrant for the Ward home and executed it on that same day.

41.     The break in tracing the box to the Ward home led Detectives to focus on Wesley Ward the adult son of Ruth and Joseph Ward who lived at home with his parents and happened to be at home when the search warrant was executed.

42.     During the search, police learned that during the week of Barbara Jean's murder, Ruth and Joseph Ward were at the seashore and Wesley, an unemployed Temple University night student, was the only one at the house (other than the Wards' cat).

43.     Police collected a number of items from the Ward home and took photographs.

44.     Police also investigated Ross Felice and conducted lengthy surveillance of him.

45.     Neither Felice nor Ward were ever arrested.

46.     A tip line was set up, requesting any and all information pertaining to the unsolved murder.  Hundreds of people called in with information and the names of possible suspects, including a number of people who identified Felice as looking like the composite sketch.

47.     The murder of Barbara Jean garnered significant media coverage locally, where the accounts of the crime and the possible perpetrator of the crime were detailed and varied, and it was featured on the national television show "Unsolved Mysteries" in 1989.  After January 1990, the media coverage went cold until Mr. Ogrod's arrest in April 1992.

48.     The tip line and the media coverage never led to any evidence or person that

implicated Mr. Ogrod in the crime.

49.     The District Attorney's Office (DAO) assisted the police by submitting the case to an investigating grand jury on November 24, 1989.

50.     Most of the evidence presented to the investigating grand jury focused on the two previously identified suspects.  One suspect presented evidence that he was at work at the time of the murder and the other suspect said he had a class scheduled during the time frame of the murder (detectives, however, were unable to confirm he attended class that day).

51.     The last witnesses were called to the investigating grand jury in this matter at the end of July 1990.  However, no presentment was issued and no arrests were made.

52.     The murder of Barbara Jean Horn became a cold case.

### THE COLD CASE INVESTIGATION

53.     In 1991-1992, there was a Special Investigations Unit within the Homicide Unit of the Philadelphia Police Department consisting of three squads lead by three different Sergeants: Defendant Nodiff, Defendant Snyder and Ray Barlow.  All three Sergeants reported to Lieutenant Defendant Washlick.  Detectives Defendants Devlin and Worrell reported to Sergeant Defendant Nodiff.  Upon information and belief, Detective Defendant Rocks reported to Sergeant Defendant Snyder.

54.     In early 1992, nearly four years after Barbara Jean's death, Defendant Nodiff assigned Defendants Devlin and Worrell to reinvestigate the unsolved murder of Barbara Jean. Defendant Nodiff and Defendants Devlin and Worrell reviewed the case file (including all of the interviews, grand jury notes, and activity sheets), spoke to the original investigators, went and "knocked on every single door in the neighborhood" to conduct neighborhood surveys, and re-interviewed people who had been interviewed during the original investigation.

55.     The homicide file also included the report from the crime lab dated September 8,

1988, which stated that blood and vomit were identified in the box Barbara Jean was found in, and spermatozoa was located in one area where vomit was detected.

56.    Coincidentally, Defendant Snyder was the assigned Sergeant and Detective Rocks was the assigned Detective on a prior, separate investigation into a homicide that occurred in the basement of the Ogrod residence, the facts of which are illuminating.

57.    On July 31, 1986, two years before Barbara Jean's murder, three men entered the Ogrod residence during the night through the front door, went to the basement where they knew Mr. Ogrod's brother, Greg, slept, and attacked Greg and his 16-year old girlfriend, Maureen Dunne (the daughter of a Philadelphia Police Detective), stabbing and clubbing them.  Dunne died from a stab wound to her heart and Greg survived.

58.    Richard Hackett was later prosecuted and convicted of the Dunne murder. Hackett lived in the Ogrod home starting in the spring of 1986 and Mr. Ogrod worked for Hackett.

59.    At the time of the attack, Mr. Ogrod was at home, asleep upstairs on the second floor of the house, and was woken by his brother's screams from the basement. Mr. Ogrod saw a man run down the street and called 911.  Then, once Mr. Ogrod got to the basement and discovered that Dunne had been stabbed, he called 911 again.  Although Mr. Ogrod was interviewed by homicide detectives, he was never called as a witness to testify at Hackett's trial.

60.    The police homicide file relating to the Dunne murder contained pictures of the basement of the Ogrod residence, including at least one picture showing a weight machine and its lateral pull-down weight bar.

61.    The lateral pull-down weight bar pictured in the Dunne homicide photograph ultimately became central to the Commonwealth's case against Mr. Ogrod specifically being

identified in the Devlin Confession (referenced below) and at both of Mr. Ogrod's trials as the purported murder weapon.

62.     Defendant Rocks testified regarding his involvement in the "processing" of the Dunne murder scene, the lateral pull-down weight bar, and claimed not to have spoken to anyone about the weight equipment depicted in the photographs despite being assigned to assist in the investigation of the death of Barbra Jean.

63.     On April 5, 1992, in response to inquiries from Defendants Devlin and Worrell, Mr. Ogrod voluntarily appeared at the Philadelphia Police Administration Building (the "Roundhouse") on a Sunday at 1:30 p.m., without an attorney, to be interviewed ostensibly as a witness.

64.     At the time he voluntarily reported to the Roundhouse, Mr. Ogrod had been awake for nearly 30 hours, having just completed an all-night, 18-hour shift driving a bakery delivery truck over a 300-mile route.

65.     Defendants Devlin and Worrell initially conducted an unrecorded "interview" in one of the interrogation rooms in the homicide division at the Roundhouse and according to their testimony, no aspect of the interview was recorded in any manner except for the statement written entirely by Defendant Devlin and signed by Mr. Ogrod (the Devlin Confession).  Despite the lack of a recording, both defendant detectives asserted in their respective testimony that the statement was a verbatim hand-written transcription of Mr. Ogrod's confession to the murder of Barbara Jean.

66.     The Devlin Confession describes a scenario in which Mr. Ogrod and Barbara Jean are standing alone in the dining room of the Ogrod residence when Mr. Ogrod "got the idea" to ask her to come down to the basement.  Mr. Ogrod then asks Barbara Jean if she would like to

play doctor, she says yes, and Mr. Ogrod proceeds to take her one-piece outfit off.  Mr. Ogrod

says he stroked Barbara Jean's shoulders and back, and then he pulled down his pants and

kneeled on the ground.  The Devlin Confession records Mr. Ogrod as saying he then held onto

Barbara Jean "real tight" and rubbed his penis against her leg.

67.    According to the Devlin Confession, Mr. Ogrod then tried to push Barbara Jean's

face towards his penis and she immediately "started to scream," at which point Mr. Ogrod held

her head, hit the top and back of her head at least four times, maybe more, and that Barbara Jean

remained motionless.

68.    The statement reads that Mr. Ogrod initially said that he hit Barbara Jean with a

pipe but then, unprompted per the Devlin Confession, Mr. Ogrod says it might have been the

lateral pull-down bar from his weight set.

69.    The Devlin Confession goes on to state that because Barbara Jean was bleeding,

Mr. Ogrod placed a cloth over her head, brought her over to the large sink next to the washer and

dryer and washed her off.  Mr. Ogrod, however, could not remember if he simply held her head

under the faucet or put her in the large sink to clean her off.

70.    As the Devlin confession continues, it reads that Mr. Ogrod then left Barbara Jean

in the large sink, went out the back door of the basement to get to the garage, and opened the

garage door, to retrieve a blue trash bag.  Mr. Ogrod then went back to the basement, covered

Barbara Jean in the trash bag, carried her into the garage, covered her in clothes, closed the

garage door, and walked toward St. Vincent Street in search of something to put her in,

ultimately grabbing a box in back of the house near the corner.  After finding the box, Mr. Ogrod

then walked back to the house, put Barbara Jean in the box, put the trash bag on top of her, and

closed the box.

71.     According to the Devlin Confession, Mr. Ogrod was initially going to put the box out but then realized the trash had already been picked up that day.  Mr. Ogrod said there were people near the dumpster next to his driveway.

72.     The Devlin Confession next reads as if Mr. Ogrod walked up to and then turned right onto St. Vincent Street and then walked across Castor Avenue however, there were people at the bus stop by the church.  So Mr. Ogrod went back to the other side of St. Vincent, where the Kutner Buick dealer was located, and walked a couple of steps down Castor, but then decided Castor was too busy.  So, Mr. Ogrod then walked back, on Castor, crossing over St. Vincent again.  At this point, Mr. Ogrod says he puts the box down because it was getting heavy.  Mr. Ogrod says he then picks it back up, walks a little further, and puts it down by some trash cans.

73.     Prompted by a question from Defendants Devlin and Worrell about the location of Barbara Jean's clothes, the Devlin Confession purports to record Mr. Ogrod's response as saying he stashed her clothes in an air vent or in the crawl space on the top of the basement wall.

74.     Per the Devlin Confession, Mr. Ogrod also said, in response to questions about whether Barbara Jean was bleeding, that Barbara Jean had been lying on a rug (noting there were little throw rugs all over the floor) and bled onto the rug; Mr. Ogrod cleaned up the blood, rolled up the rug and threw it out.  Responding to another question, Mr. Ogrod said he did not think he ever removed the clothes from the basement.

75.     According to the Devlin Confession, Mr. Ogrod said he could not recall if he ejaculated, he did not see anyone else in the house, he did not remember talking to anyone while carrying the box, and that the weight bar was 2-2.5 feet long and bent down at both ends.

76.     At the conclusion of the Devlin Confession, Mr. Ogrod identified the box and Barbara Jean in photos Defendants Devlin and Worrell showed him; denied knowing Ward; said

that Barbara Jean came to the door twice on the day of the murder, but he could not recall if he answered the door both times.

77.     The Devlin Confession does not contain any information claiming that Mr. Ogrod washed himself or changed his clothes after the violent altercation and prior to leaving his home with the box.

78.     Between 7:15 and 7:45 a.m. on April 6, 1992, Mr. Ogrod called Peter Blust, an attorney that Mr. Ogrod knew through a mutual acquaintance.  During that call, Mr. Ogrod was "highly excited" and told Blust the police were telling him that he killed a little girl in the neighborhood, that they knew he did it, and they told him he just had a mental block about it.

79.     Blust asked Mr. Ogrod why he did not call earlier and Mr. Ogrod replied that he wanted to call, but the police said that they would make an appointment with his lawyer.  Mr. Ogrod said that in the meantime they were going to arrest him, and put him in general population and, when the story hit the news, "they would kill him in general population."

## THE FIRST CRIMINAL TRIAL

80.     Before his first jury trial, Mr. Ogrod moved to suppress the Devlin Confession, claiming that it was involuntary and coerced.

81.     During that hearing, Blust and Howard Serotta, Mr. Ogrod's landlord of his apartment in Glenside where he lived at the time of his interrogation and arrest, testified.

82.     Serotta was called as a witness because on April 1, 1992, police contacted Serotta and said they wanted to talk to Mr. Ogrod about "something that had happened in the past."

83.     During that contact, police asked Serotta if Mr. Ogrod was working, how long Mr. Ogrod had lived in the Glenside apartment, how well Serotta knew Mr. Ogrod, and various questions about Mr. Ogrod's "general living habits."

84.     Significantly, police also asked Serotta if Mr. Ogrod had any weightlifting equipment, which Serotta found strange at the time.

85.     Mr. Ogrod's trial attorney also called his psychiatrist, Dr. Gamine, as a witness in the motion to suppress.

86.     Mr. Ogrod was Dr. Gamine's patient from 1976 until 1990. Dr. Gamine said he was not an expert in false confessions, but noted that they did happen.  Dr. Gamine talked about his treatment and Mr. Ogrod's limited ability to cope with stress (manifested after Mr. Ogrod's discharge from the army), working with Mr. Ogrod to deal with being teased at school, the ongoing mental health issues with Mr. Ogrod's mother, and how Mr. Ogrod was suggestible and could be manipulated.

87.     Dr. Gamine, however, did not conduct any diagnostic testing on Mr. Ogrod since he was a treating psychiatrist and there was no clinical reason to test Mr. Ogrod during the time Mr. Ogrod was his patient.

88.     Dr. Gamine also discussed implanted memories, but recognized its novelty when he stated that it was "just starting to be written about and was not yet accepted in the field."

89.     The suppression motion was denied, and the case proceeded to trial in the fall of 1993.

90.     The lead trial prosecutor for the Commonwealth was Assistant District Attorney (ADA) Joseph Casey.

91.     Mr. Ogrod was represented by Mark Greenberg.

92.     Opening statements began on October 21, 1993.

93.     During the first jury trial, Mr. Ogrod testified in his own defense and described his account of what occurred during the interrogation that led to the Devlin Confession.

94.     According to his testimony, the interrogation tactics utilized by Defendants Devlin and Worrell included confronting him with pictures of Barbara Jean's body in the box, accusing him of having committed the murder, and, when he insisted he had nothing to do with it, repeatedly telling him that he was mentally blocking any memory of the murder and they were only trying to help him remember.

95.     Mr. Ogrod testified that during the interrogation, Defendant Devlin closed the door and blocked him multiple times when he attempted to leave the interrogation room.

96.     Mr. Ogrod also testified that he was never given the opportunity to make a telephone call despite multiple requests during the course of the interrogation.

97.     Other than the Devlin Confession, which was contested by Mr. Ogrod's testimony, no other evidence directly linking Mr. Ogrod to the murder was presented.

98.     Closing arguments ended on November 1, 1993 and the jury was charged on November 2, 1993.

99.     On November 4, 1993, after multiple days of deliberation, the jury returned with a unanimous verdict of not guilty and marked the verdict slip accordingly.

100.    However, as the jury foreman was about to read the verdict aloud, one juror stated in open court that he did not agree with the verdict and the judge immediately declared a mistrial.

101.    Both the trial itself and the chaos surrounding the mistrial resulted in substantial and factually-varied media coverage.

### THE SECOND CRIMINAL TRIAL

102.    The lead prosecutor for the second trial of Walter Ogrod was ADA Judith Rubino.

103.    Mr. Ogrod retained Greenberg for the second trial as well. Discovery prior to the second trial was limited to: (i) Letter to Joe Casey from Jay Wolchansky; (ii) Letter to Lynne

Abraham from Jay Wolchansky; (iii) Statement from Jay Wolchansky (3-20-95); and (iv) Statement of John Hall (1-6-95).

104.    On January 29, 1996, in anticipation of the upcoming second trial, Greenberg requested criminal extracts for Wolchansky and Hall and he inquired as to whether Hall or Wolchansky received consideration in connection with their testimony in Mr. Ogrod's case or any other case.

105.    There is no responsive letter from ADA Rubino to Greenberg regarding Hall and Wolchansky.  However, Greenberg cross-examined Wolchansky on his criminal history and Wolchansky denied he was given a deal in his pending cases.

106.    Mr. Ogrod's defense investigators and Greenberg himself attempted to track down cases in which either Hall or Wolchansky had been a witness for the Commonwealth.  The limited findings of this defense investigation demonstrate that the Commonwealth did not disclose Hall's prior cooperation in *multiple cases* in both Philadelphia and other neighboring jurisdictions.

107.    Sometime around August 14, 1996, Greenberg learned from Mr. Ogrod himself that both Hall and Wolchansky were witnesses in the Dickson case again indicating no disclosure from the Commonwealth.

108.    Mr. Ogrod's second jury trial began in the fall of 1996.

109.    During the second trial, the Commonwealth called three of the eyewitnesses that saw the man carrying the box on the date of the murder: Massi, Kochan, and David Schectman.

110.    Consistent with their earlier statements and testimony, none of the eyewitnesses identified Mr. Ogrod as the man they saw carrying the box containing Barbara Jean's body.

111.    Even though he did not participate in the autopsy, Dr. Haresh Mirchandani,

Philadelphia's Chief Medical Examiner at that time, testified to the autopsy results.

112. Dr. Mirchandani's testimony was based upon his review of the records of the autopsy performed by Dr. Hoyer.

113. Dr. Mirchandani testified that the blows to Barbara Jean's head were the cause of death and that the weight bar was consistent with what could have caused those injuries.

114. Dr. Lucy Rorke, a forensic neuropathologist retained by the Commonwealth, examined the victim's brain and testified similarly that as a result of blows to the head, the victim's brain swelled, the diffuse axonal injuries indicated significant force was used, and that the head injuries were consistent with having been caused by an object like the weight bar or a tire iron.

115. Just as she did in the first trial, Dr. Rorke steered clear of opining about a cause of death. ADA Rubino asked Dr. Rorke if she was able to determine, from the damage to the brain, what actually caused Barbara Jean to die. Dr. Rorke never answered this question. Instead, Dr. Rorke responded by discussing the fact that she identified brain swelling and diffuse axonal injuries caused by significant force applied to the child's head. ADA Rubino then asked Dr. Rorke if she saw any indication of possible suffocation, a hand over the child's mouth, or anything of that nature. Dr. Rorke responded "no."

116. Dr. Rorke then opined that the injuries to Barbara Jean's brain occurred within a half hour or an hour before her death.

117. When asked by ADA Rubino what would be observed if suffocation occurred, Dr. Rorke told jurors that, if there was prolonged (defined as 15-20 minutes) suffocation, you might see a change of color intensity in gray matter of the brain to a darker color (from a decrease of oxygen in the blood and increase of carbon dioxide). However, if a hand was held over the child's mouth for short period of time to stop her from screaming, then one would not see any

20

changes in the brain.

118.     Then contrary to ADA Rubino's trial notes and what the science tells us now, Dr. Rorke essentially repeated that asphyxia/suffocation did not occur when she concluded the only cause of the damage she saw to Barbara Jean's brain was traumatic injury.

119.     Meanwhile, Sergant Snyder's contemporaneous notes from Dr. Hoyer's autopsy, located in the DAO trial file yet never introduced at trial, indicate that the weapon used to inflict the head injuries was "probably a 2x2 or a 2x4. Something lighter than a baseball bat or tire iron."

120.     The only significant new evidence offered by the Commonwealth at the second jury trial was the testimony of Jay Wolchansky (who testified under the alias Jason Banachowski).

121.     Wolchansky testified that while he was in prison with Mr. Ogrod between the first and second jury trials, Mr. Ogrod confessed to him ("Wolchansky Confession").

122.     The Commonwealth also elicited testimony from Wolchansky that Mr. Ogrod told him he had threatened his own mother after she accused him of committing the murder.

123.     Unlike in the first trial, Mr. Ogrod did not testify at the second trial.

124.     In her closing arguments, ADA Rubino argued that Wolchansky had no deal with the Commonwealth in exchange for his testimony, the only way Wolchansky could have gotten information about the crime was from Mr. Ogrod, and that Mr. Ogrod had admitted his guilt to his mother.

125.     When the case was sent to the jury for deliberation in the second trial, the only evidence the jury had linking Mr. Ogrod to the murder was the Devlin Confession and the Wolchansky Confession.

126.    Mr. Ogrod was convicted of first-degree murder and attempted involuntary deviate sexual intercourse, and was sentenced to death.

**POST CONVICTION RELIEF & THE CONVICTION INTEGRITY UNIT**

127.    On June 8, 2005, after his direct appeals were denied and the conviction and sentence became final, Mr. Ogrod filed a *Pro Se* Petition seeking relief under the Post Conviction Relief Act (PCRA).

128.    Among other things, this PCRA filing along with subsequent filings, raised claims of actual innocence, *Brady/Napue* violations, and ineffective assistance of counsel pertaining to the Devlin and Wolchansky Confessions (the only evidence linking Mr. Ogrod to the crime).

129.    On March 2, 2007, Mr. Ogrod filed his initial motion for discovery in connection with the PCRA proceedings, including a request for DNA testing of available forensic evidence.

130.    Then, over the course of several years, Mr. Ogrod and the PCRA Unit of the DAO engaged in pre-petition discovery and related litigation.

131.    On June 24, 2011, Mr. Ogrod filed a counseled Amended PCRA Petition.

132.    On April 4, 2013, the Commonwealth filed a Motion to Dismiss the Amended Petition.

133.    Mr. Ogrod filed his second Motion for Discovery on June 11, 2013, including a renewed request for DNA testing.

134.    In 2014, the Commonwealth agreed to DNA testing of biological matter from the homes of initial police suspects Ward and Felice, but opposed DNA testing of any evidence obtained from the victim or the autopsy.

135.    The evidence from the alternate suspects' homes was analyzed, some of the evidence was too degraded and/or contaminated to be meaningfully tested and the evidence

22

suitable for testing that yielded a DNA profile was not a match to the victim.

136.    The counsel Amended PCRA Petition was amended and supplemented twice. The First Amendment and Supplement to Amended PCRA Petition was filed on October 21, 2014 and the Second Amendment and Supplement was filed on December 3, 2016.

137.    In 2017, the Commonwealth agreed to an evidentiary hearing as to the following three claims of ineffective assistance of counsel: (i) trial counsel's ineffectiveness for failing to retain expert assistance from a medical examiner to refute Dr. Mirchandani's testimony regarding the murder weapon used during the crime; (ii) trial counsel's ineffectiveness for failing to offer appropriate and relevant evidence to prove the defendant's "confession" was involuntary; and (iii) trial counsel's ineffectiveness for failing to investigate and proffer appropriate and relevant mitigation evidence during the penalty phase of trial.

138.    In February 2018, pursuant to a request from Mr. Ogrod's counsel, the case was transferred to the Conviction Integrity Unit of the District Attorney's office for review and investigation of his actual innocence claim.

139.    In October 2018, the CIU and Mr. Ogrod's counsel agreed to conduct further DNA testing of all relevant and available evidence.

140.    The parties also entered into a Discovery and Cooperation Agreement which allowed Mr. Ogrod's counsel to review, for the first time, the Commonwealth's files for Mr. Ogrod's case, *Commonwealth v. Richard Hackett, et al.* CP-51-CR-0933912-198, and the files for a number of other cases involving jailhouse informants, Hall and Wolchansky (Commonwealth v. Jean Claude Pierre Hill, CP-51-CR-0438891-1991; Commonwealth v. David Dickson, CP-51-CR-0732711- 1993; Commonwealth v. Herbert Haak and Richard Wise, CP-51-CR-1205942-1995; Commonwealth v. Tremayne Smith, CP-51-CR-700151-1994;

Commonwealth v. Jay Wolchansky, CP-51-CR-205731-1995; and CP-51-CR-0103571-1995).

141.    Mr. Ogrod's defense counsel's and the CIU's review of these files uncovered additional previously undisclosed, exculpatory documents that constitute *Brady* evidence

## DNA Evidence

142.    In an effort to determine whether further DNA testing could be conducted, the CIU performed a search and inventory of all biological matter collected by the police.

143.    Once the biological evidence was located and identified, Bode Technology was hired to assess whether that evidence was suitable for DNA testing and to perform the tests.

144.    Bode Technology determined that the only DNA evidence suitable for testing was a sample of wash recovered from the autopsy table after Barbara Jean's autopsy.

145.    The wash produced a full male DNA profile suitable for comparison.

146.    The CIU then collected a buccal swab reference sample from Mr. Ogrod on June 4, 2019.

147.    Bode Technology subsequently reported that Mr. Ogrod was excluded as a contributor to the DNA profile produced by the wash recovered from the autopsy table.

148.    The profile was uploaded to local, state, and national DNA databases (CODIS) between October 10, 2019 and November 19, 2019. On November 19, 2019, the Philadelphia Police Department's Office of Forensic Sciences reported to the parties there had been no hits at the State or National level, but the sample would be continually searched and any associations would be reported appropriately.

149.    To date, there have been no known hits to the DNA profile uploaded to CODIS.

150.    As a result of the CIU investigation, all physical evidence obtained in relation to the murder of Barbara Jean has now been subjected to DNA testing and law enforcement now

has the DNA profile of an unknown male whose DNA was found in the body wash from Barbara
Jean's autopsy.

**Murder Weapon**

151.     In 2018, the CIU retained Dr. Ljubisa J. Dragovic, an expert in both forensic
pathology and forensic neuropathology, and Kirk L. Thibault, Ph.D., a biomechanical engineer
and expert in human injury biomechanics, to evaluate the case, including evidence from the post-
mortem examination of Barbara Jean regarding the cause of death and the murder weapon.

152.     Dr. Dragovic reviewed the primary evidence, the autopsy reports and
photographs, before reviewing any of the testimony or expert reports developed during the
PCRA proceedings.

153.     Upon completing his review, Dr. Dragovic's opinion is, to a reasonable degree of
medical certainty, that the conclusions reached by Dr. Hoyer and Dr. Mirchandani that Barbara
Jean died from cerebral injuries are not supported by medical science.

154.     According to Dr. Dragovic, Barbara Jean's death was caused by something other
than a head injury.

155.     The CIU also interviewed Dr. Ian Hood, an expert who had previously been
retained by the PCRA Unit for the sole purpose of evaluating whether the weight bar could be
the "murder" weapon.

156.     After determining that Dr. Hood had not previously been provided with sufficient
information, the CIU requested that Dr. Hood consider additional information and then review
the entire case instead of the narrow question that had been posed to him.

157.     After reviewing additional information and meeting with the CIU, Dr. Hood told
the CIU that the head injuries were not the cause of Barbara Jean's death.  Dr. Hood stated that

the cause was likely asphyxia, which would not necessarily produce medical findings, but would explain why Barbara Jean's brain was heavier than it was supposed to be at the time of autopsy.

158.    Dr. Dragovic noted in his report that the next step in the autopsy should have been to consider asphyxia by smothering or asphyxia by drowning through a meticulous gross microscopic examination of Barbara Jean's respiratory system.  However, the tissue slides taken at autopsy in this case could not be located for Dr. Dragovic's review and the autopsy report failed to include a microscopic evaluation of the lung tissue.  As a result, a formal conclusion of asphyxia could not be included in Dr. Dragovic's report.

159.    Dr. Dragovic concluded that the lack of damage to the skull and brain, coupled with the narrow nature of the resulting wound margins on the scalp, indicate that the object used to cause the "tears/cuts" in the victim's scalp was "rather light in weight and relatively thin in profile."

160.    Dr. Hood agreed with Dr. Dragovic that the weapon that caused the head lacerations on Barbara Jean had to be something narrow, likely with sharp edges.

161.    Dr. Thibault also examined the available evidence, including a weight bar that was of the same make and model as the weight bar in the Ogrod basement.

162.    Dr. Thibault concluded, based upon his review of the post-mortem findings, that Barbara Jean's injuries were not compatible with being struck by the weight bar as described in the Devlin Confession, particularly in the absence of skull fractures and underlying focal brain injuries.

163.    Accordingly, Dr. Thibault also disagrees with the conclusions of the Commonwealth's trial witnesses as to the possibility that the weight bar caused the injuries to Barbara Jean's head.

164.     On June 15, 2017, Dr. Hoyer provided a sworn statement to Mr. Ogrod's counsel in which he stated that, due to the lack of any fractures to the victim's skull, it is unlikely that the weight bar was the murder weapon.  He also believes that the head wounds would have bled profusely.

165.     Counsel for Mr. Ogrod also obtained a report from Dr. Marcella Fierro, the Retired Chief Medical Examiner of the Commonwealth of Virginia and a past president of the National Association of Medical Examiners.  Dr. Fierro also concluded that the weight bar did not cause the injuries to Barbara Jean's back and head and the cuts to her scalp would have bled profusely.  Dr. Dragovic concluded that the three, similarly shaped bruises on Barbara Jean's shoulders and back are "hickeys."  Dr. Hood agreed that they could be hickeys, but they were likely inflicted by a large adult due to their size.  All doctors agree that these injuries were not likely caused, as previously alleged, by the weight bar.

166.     Dr. Thibault concluded that the weight bar was not biomechanically compatible with these bruises due to the lack of fracture to the scapulae.

167.     In sum, the Commonwealth's trial theory, the Devlin Confession and the Wolchansky Confession, each of which rest on the notion that Barbara Jean died from trauma to the head inflicted by the weight bar, are not supported by the medical findings or the available science.

**Coerced Confession**

168.     The CIU, in conjunction with Mr. Ogrod's defense counsel, interviewed Serrotta, David Schectman, Kochan, Ingrid Green, Linda Green, Charlie Green, Jr., Mindy and Raymond O'Brien, Heather Wolchansky, and Phyllis Hall.  Several of these witnesses revealed new evidence regarding the unreliability of the Devlin Confession which is detailed herein.

169. The CIU (for the case of Willie Veasy and other cases) attempted to interview both Defendants Devlin and Worrell.  Both refused to speak to the CIU.

170. The CIU also separately interviewed Margaret Kruse, ADA Judy Rubino, Mark Greenberg, Dr. Ian Hood, Dr. Bruce Wright, Dr. Paul Hoyer, Sharon Fahy, and Barbara Palumba.

171. Mr. Ogrod's defense team, along with the CIU, spoke to members of the Green family who recounted similar abusive tactics utilized when Defendant Devlin and other detectives questioned them during the reinvestigation of the Barbara Jean murder, particularly following Mr. Ogrod's arrest.

172. During the CIU interview of Serotta, Serotta had limited recollection of his trial testimony, yet he vividly recalled finding it strange that police never came to search Mr. Ogrod's apartment in Glenside.

173. Unbeknownst to Mr. Ogrod at the time of trial, the similar interrogation tactics used on him were also used on the Fahys.

174. In March 1992, the Fahys retained an attorney who sent a letter to ADA Casey requesting that detectives contact the Fahys through him because of their treatment by Defendants Nodiff, Devlin, and Worrell:

> First of all, they were upset about the treatment that they received from Larry Nodiff, Marty Devlin and Paul Worrell.  Apparently, the Fahys were invited to go to the PAB and were led to believe that they were going to be updated regarding the progress of the investigation.  Instead, they were detained for over four hours during which time Sharon was given a polygraph examination and accused by Det. Devlin of withholding information that her husband had killed their daughter.

175. In the CIU interview of Ingrid Green (with Mr. Ogrod's defense counsel), Ingrid stated that her mother and father (Linda Green and Charles Green, Sr.) were home all day and

would have seen or heard something particularly because the house was small and the stairs to the basement were loud and creaky.  Linda said that she would have heard Barbara Jean if she had been screaming in the basement, but could not be certain because the air conditioner in the kitchen was noisy.

176.    Ingrid also said that Greg's car had been firebombed years earlier and the burned-out car was out back, so no one went in or out the basement door.

177.    Ingrid also said that she would frequently go down to the basement to do laundry after Barbara Jean was murdered. Ingrid said she never saw blood.

178.    In the CIU and Mr. Ogrod's defense counsel interview of Linda Luterman (Green) and Charles Green, Jr., they also agreed that no fresh blood was visible in the basement after the murder, nor where there any signs of a struggle.  Linda was in the basement every day to do laundry, and she saw no fresh blood or signs of a struggle there after Barbara Jean was killed.  Nothing in the basement had been disturbed.

179.    Linda also stated that there were no rugs in the basement at the time of Barbara Jean's murder.  Linda recalled that at some point there had been a throw rug on the basement floor, but agreed with Charlie that it had been placed there after the murder, when a friend named Tommy moved into the basement.

180.    On the afternoon of the murder, Linda had been in the kitchen preparing a roast for dinner and her husband was asleep in the living room after taking some medication for pain.

181.    Linda never saw Mr. Ogrod with Barbara Jean, a box, or a plastic trash bag on the day of the murder, nor did she ever see Mr. Ogrod enter the kitchen (where the plastic trash bags were kept) on the afternoon of the murder.

182.    Knowing many of the facts of the Devlin Confession are demonstrably false, Mr. Ogrod's counsel retained James Trainum, a retired Washington, DC homicide detective, to

review this case.

183.    Trainum concluded that the circumstances surrounding the Devlin Confession are similar to circumstances in known false confession cases in several respects, including the use of elements of the highly-coercive "Reid Technique" for interrogations.

184.    Trainum concluded that "anyone assessing this case should have grave concerns about the validity and reliability" of the Devlin Confession.

185.    Counsel for Mr. Ogrod also obtained reports from psychologists Dr. Bruce Frumkin, Dr. Frank Dattilio, and Dr. Neil Blumberg, each of whom examined Mr. Ogrod and concluded that he was highly suggestable and had a personality that is prone to manipulation and undue persuasion by others.  Dr. Frumkin administered the Gudjonsson Suggestibility Scales Test to Mr. Ogrod, which concluded that he is more suggestive than 95% of the population and has a strong tendency to yield to misleading or false information.

186.    As part of the CIU's investigation of the Devlin Confession, the CIU consulted Dr. Christian Meissner and Colonel Steven Kleinman, two experts in interviewing techniques and false confessions, and asked them to conduct an assessment of the reliability of the Devlin Confession to specifically determine the extent to which the statement (i) provided any new information unknown to investigators at the time of the interview that was later corroborated by further investigation, (ii) contained information known to investigators that, given the use of accusatorial approaches and suggestive/leading questions, could constitute contamination, and (iii) included information that was inconsistent with known facts in the case.

187.    In a report submitted to the CIU, Dr. Meissner and Colonel Kleinman concluded Mr. Ogrod's statement "failed to include any novel information about the crime, nor did he provide any information in his statement that would have demonstrated unique, guilty knowledge

of the crime outside of information already known to police and/or the public via media coverage of the incident."

188.     More specifically, many of the details included in Mr. Ogrod's statement were already known to police at the time of his interrogation, such as Barbara Jean being hit in the head and her body being washed and then wrapped in a trash bag and left in a box in a vicinity near her home.

189.     In contrast to what was publicly known about the crime, Mr. Ogrod's statement also included information that was inconsistent with the available evidence, including such details as (i) the clothing worn by the victim (one-piece vs. two-piece), (ii) the lack of any forensic evidence indicating the presence of blood or body fluids in the basement, (iii) the absence of any throw rugs in the basement at the time of the incident, (iv) that the back door to the garage could not be opened at the time of the incident, and (v) that the weight bar used to strike the victim was inconsistent with the type of wound indicated by the autopsy and subsequent expert review of that autopsy.

190.     Given the available scientific understanding of (i) the interrogation techniques and situational factors that can lead an innocent person to provide a false confession, (ii) the particular vulnerabilities of certain individuals who are more susceptible to interrogation, and (iii) the lack of indicia of reliability in the statement provided by Mr. Ogrod, the ultimate conclusion provided in the written expert report is that the Devlin Confession was not only unreliable but almost certainly coerced.

**Unreliable Jailhouse Informants**

191.     In an effort to assess the collusion between Hall and Wolchansky and the jailhouse informant testimony used against Mr. Ogrod at trial, the CIU consulted with Professor

Alexandra Natapoff, a legal expert in the use and abuse of jailhouse informants.

192.     After consultation with Professor Natapoff and review of relevant information, the CIU has concluded there are significant red flags present in this case regarding the inherent unreliability of the Wolchansky confession.

193.     More specifically, there is substantial evidence that Hall and Wolchansky colluded in order to bolster the credibility and to enhance the value of their cooperation to the government.

194.     As a result of the inherent and demonstrated risks of collusion, unreliability, and perverse incentives, Wolchansky's testimony should be viewed with presumptive skepticism.

195.     Said skepticism is particularly important because, as described more fully below, Hall and Wolchansky presented the same or similar evidence in Mr. Ogrod's case and, as noted by Professor Natapoff, that is a red flag for unreliability.

196.     The Wolchansky Confession was fabricated by John Hall, a notorious jailhouse cooperator known as the "Monsignor" due to his long track record of purportedly obtaining jailhouse confessions, disclosing those confessions, and using his cooperation in these cases in order to obtain leniency in his own criminal cases.

197.     The CIU was unable to interview Hall as he is deceased.  However, the CIU did interview his wife, Phyllis Hall.

198.     The CIU also obtained hundreds of letters written by Hall to Phyllis while he was incarcerated and Phyllis verified that the handwriting in the letters is Hall's.

199.     Phyllis helped Hall gather newspaper articles and, even assisted Hall in his "snitch scheme" by writing to Mr. Ogrod pretending to be a stripper that wanted to befriend him. She did this to get Hall additional information about Mr. Ogrod (Hall's letter indicates that the

articles Phyllis gathered did not have enough details about the case, so Hall pursued getting additional details about the case from Mr. Ogrod).

200.    Hall's "snitch scheme" as reported by Phyllis is corroborated by pages of notes taken by Hall dated December 22-29, 1994.

201.    Hall's handwritten letters to his wife Phyllis describe: (i) how he compiled information in order to fabricate the Wolchansky Confession; (ii) that he used the information he compiled on Mr. Ogrod first, before he gave the information to Wolchansky; (iii) he encouraged Wolchansky to  go  ahead on the Dickson case,  but Wolchansky "blew it,";  (iv)  Hall  learned Wolchanksy "blew the case" when Wolchansky got transferred to Bucks County at Hall's direction  and  immediately write  to  ADA  Roger King;  and  (v)  he had  previously fed  other jailhouse  informants information in another criminal case.

202.    Hall's letters to Phyllis also claim that because of his and Wolchansky's assistance and cooperation in Mr. Ogrod's case, "Everybody made out."

203.    Before he died, Hall provided a sworn statement to Mr. Ogrod's defense counsel that he was the individual who provided Wolchansky with all of the details of the Wolchansky Confession.

204.    In the Joint Stipulation of Fact dated February 28, 2020, the CIU confirmed that it had reviewed information that independently corroborates Hall's sworn statement referenced above.  The CIU did a thorough comparison of each fact contained in Wolchanky's testimony with his prior letters as well as Hall's letters and statements about the Mr. Ogrod confession.  In addition, the CIU investigated whether a fact offered by Wolchansky or Hall was available via the media coverage of the first trial and provided a detailed analysis of the same.

205.    This comparison revealed a striking similarity between Hall and Wolchansky's

stories.  In fact, they were exactly the same in many respects.  In addition, most of facts of the crime itself were contained in media coverage.

206.    By way of illustration, the CIU found that both Hall's letter and Wolchansky's testimony state that Mr. Ogrod planned Barbara Jean's abduction and intended to use an electrical cord to strangle her, but when it was missing, he used the weight bar.  Both said Mr. Ogrod confessed guilt to his mother.

207.    Not surprisingly, based on the contents of his letters to Phyllis, Hall provides additional, smaller details about each fact in his letter; however, both of their narratives are essentially the same and, as noted by Professor Natapoff, this, by itself, is a red flag for unreliability.

208.    A review of the central facts used in both the Wolchansky Confession and in Hall's statement regarding Mr. Ogrod's purported confession are demonstrably false.

209.    Of great import is that both Hall and Wolchansky claimed Mr. Ogrod confessed to killing Barbara Jean with the weight bar.  According to Wolchansky, Mr. Ogrod became enraged, grabbed the weight bar. and hit Barbara Jean in the head.  Meanwhile, Hall said Mr. Ogrod confessed to smashing her skull in.  Both accounts of the crime are similar in their facts and in their falsity.

210.    In addition, Phyllis stated that Hall told her he fabricated the details of the Wolchansky Confession and provided those details to Wolchansky.

211.    Based on the comparison of their statements to each other, the known facts of how Barbara Jean died, and Hall's letters to Phyllis, Phyllis's statement is credible.


**Cause of Death**

212.     Based on the trial preparation notes of ADA Rubino, Dr. Rorke also concluded that Barbara Jean died from asphyxia and not the injuries to her head.

213.     Although Dr. Rorke testified for the Commonwealth in both trials, ADA Casey and ADA Rubino never asked her to opine on cause of death; thus, she managed to steer clear of offering her medical opinion that Barbara Jean died from asphyxia.  In 2019, as part of the CIU's effort to locate slides and photos documenting the original autopsy, the CIU reached out to Dr. Rorke, now retired, regarding whether she would have taken photographs of Barbara Jean's brain in this case.  In order to refresh Dr. Rorke's recollection of the case, the CIU provided her copies of both of her original reports.  After reviewing the reports, Dr. Rorke informed the CIU that "it is unlikely that I would have taken any photographs of the brain as the abnormalities [sic] on gross examination were not too exciting."  That statement is contradictory to the testimony she gave in both trials.

**Evidence Withheld**

214.     Defendant Rocks' type-written description of the Mr. Ogrod basement in the Dunne homicide file indicates that the inside, wood door from the basement to Mr. Ogrod's driveway was nailed shut and the top slide lock secured.  There was also an outer wood door.  There was no indication of locks or nails, but he noted that a large transmission was pushed up against the outer wood door.  This contradicts the Devlin Confession, which states that Mr. Ogrod entered and exited the basement on the date of the murder through this basement door.  Although the photograph of the weight set, including the weight bar, was disclosed prior to trial, the detective's type-written notes were not disclosed.  Instead, the notes were disclosed to Mr. Ogrod's defense counsel during the CIU investigation.

215.     An undated five-page document found in the DAO trial file entitled

"Supplemental Investigation of Walter J. Ogrod" recounts nine interviews conducted by the Commonwealth of Ogrod's former teachers at Ashbourne School, with the stated purpose of developing a "personality profile" of Mr. Ogrod.

216.    These nine interviews characterize Mr. Ogrod as a complacent, socially inadequate youngster who followed the lead of others, was unable to make decisions for himself, and would do anything to please others.

217.    According to the five-page document, those who interacted with Mr. Ogrod on a daily basis during his school years told interviewing police that he was "not a troublemaker," but rather "a very passive individual" who "would do anything to be accepted by his peers."

218.    During the various interviews, former teachers described Mr. Ogrod as:

- "a socially emotionally disturbed student,"

- "a follower who was not able to make his own decisions,"

- "a follower who often kept to himself and who only got in trouble passively by being in the wrong place at the wrong time,"

- "a very sad individual who felt ostracized by the other students and could be persuaded by them to do anything,"

- "a follower who kept to himself and stayed out of trouble,"

- "a square type of kid who got teased a lot and wanted to be liked by the tougher boys in school," and

- someone who "would go out of his way to make other people happy."

219.    These interviews were not disclosed to Mr. Ogrod or his counsel prior to either of his trials.

220.    Disclosures from the CIU revealed that Defendants Devlin and Worrell have a history of engaging in improper and coercive interrogation techniques that have resulted in the reversals/vacaturs of several convictions.

**Pattern and Practice**

221.    The Devlin Confession bears striking similarities in length, structure, and specificity to other purported confessions taken by Defendants Devlin and/or Worrell that were also later found to be either unreliable and/or false.

222.    In 1993, the same year as Mr. Ogrod's first jury trial, Anthony Wright was convicted of the rape and murder of Louise Talley.  Key to the conviction was Wright's purported "confession" as written by Defendant Devlin and Detective Manuel Santiago.  In 2014, after DNA evidence from the crime implicated another man, Ronnie Byrd, the Philadelphia DAO agreed to vacate Wright's conviction, but elected to retry him.  During both of Wright's trials, Wright testified about the circumstances surrounding the alleged "confession," stating that Defendant Devlin and Santiago physically and mentally abused him, forcing him to sign a confession that was not true.  During Wright's second jury trial, Defendant Devlin denied mistreating Wright and maintained that he had transcribed Wright's confession verbatim by hand, the same assertion that he made with respect to the confession he wrote down in Mr. Ogrod's case.  Defendant Devlin testified that, as Wright spoke, he never asked Wright to slow down so he could keep up; however, when asked to demonstrate how he accomplished this feat with the confession being read aloud to him, Defendant Devlin was unable to replicate this handwritten transcription in the courtroom.  Wright was acquitted at his second jury trial on August 22, 2016.  Following his acquittal, Wright brought suit against the City of Philadelphia and several detectives (including Defendant Devlin) for civil rights violations under 42 U.S.C. § 1983.

223.    Through the course of the litigation in Wright's civil case, and another involving Shaurn Thomas, allegations regarding a pattern and practice of eliciting false statements by

Defendants Devlin and Worrell came to light.

224.    In *Commonwealth v. Shaurn Thomas*[2], the Philadelphia police investigated the murder of Domingo Martinez between 1990-1993 (before Mr. Ogrod's first jury trial). Shaurn Thomas was convicted of that crime, but later exonerated based on the suppression of exculpatory evidence that included exculpatory statements in the police homicide file and police reports that identified additional suspects and rebutted key prosecution witnesses. All of this evidence was withheld from Thomas' counsel.  During the subsequent Federal Civil Rights lawsuit, John Stallworth, who was a key witness for the prosecution against Thomas, described being interrogated by Defendants Devlin and Worrell and how that led to him giving a statement implicating himself and others, including Thomas, in the Martinez murder.  In a deposition in the civil lawsuit, Stallworth testified that the detectives physically abused him and provided him with facts about the case that he used in his inculpatory statement.

225.    *Commonwealth v. Carl Tonez* was a case tried in 1991 (before both of Mr. Ogrod's trials in this matter).  The *Tonez* case also involved an interrogation by Defendants Devlin and Worrell that also lead to a false confession.  At trial, Tonez testified that he repeatedly told detectives he was not involved in the murder at issue.  Tonez also testified that the detectives used physical force and that he thought they would beat him to death.  Tonez ultimately signed his name backwards on one page of his "confession" to indicate he was forced to sign (and in the purported confession Tonez also named Ed Williams as having committed the murder with him even though Williams had an alibi).

226.    In *Commonwealth v. Jack Combs*, the police investigated the deaths of Roy Sheppard and Christian Bradley in 1990 (also before Mr. Ogrod's first jury trial).  Witnesses

---

[2] *Commonwealth v. Clayton Thomas, Jr*. - Shaurn's brother, Clayton Thomas, was also subject to similar misconduct and was ultimately also exonerated in 2017.

initially told Defendant Devlin that they saw a man shoot another man and then turn the gun on himself to commit suicide.  In their second statements to Defendant Devlin, however, these same witnesses said that Combs took the gun and shot a second man.  Two of the witnesses, young girls at the time, testified that Defendant Devlin threatened them with time at the Youth Study Center or jail time if they did not change their statements to say that Combs had committed a murder.  Mr. Ogrod's PCRA counsel obtained affidavits from four witnesses from the *Combs* case during the pendency of these PCRA proceedings: Robert Berrian, Quiana Mosley, Atiya Nelson, and Dana Williams (all describing how they were questioned by Defendant Devlin outside the presence of their parents and subjected to physically and psychologically coercive tactics in an effort to get them to back off their initial police statements regarding the murder).

227.    In *Commonwealth v. Willie Veasy*, police investigated a January 24, 1992, shooting involving Efrain Gonzalez (who survived) and John Lewis (who did not).  On June 9, 1992 (prior to Mr. Ogrod's first jury trial), Defendants Devlin and Worrell interrogated Willie Veasy.  The interrogation was not recorded, and Defendant Devlin wrote the questions and answers in the statement himself by hand just like the Devlin Confession in this case.  In the statement written by Devlin (which Veasy moved to suppress at trial), Veasy purportedly confessed to being present at the crime scene and shooting at two "Puerto Rican-looking" guys. (Additionally, Mr. Veasy alleges that the detectives coerced a witness who is legally blind to provide false testimony against him.).  However, during trial, Veasy presented evidence showing that he was working at a Houlihan's restaurant in Jenkintown, at least a twenty-minute drive from the crime scene, on the night of the shooting.  On October 9, 2019, Mr. Veasy's conviction was vacated in light of the evidence of Mr. Veasy's innocence and the Commonwealth *nolle prossed* the case.

228.     Mr. Ogrod had no evidence Defendants Devlin and Worrell engaged in a pattern and practice of using coercive techniques to obtain confessions and incriminating statements so Mr. Ogrod could not, and did not, present any other evidence of other false confessions/statements elicited by Defendants Devlin and Worrell.

**Wolachansky Confession**

229.     During the second jury trial, Mr. Ogrod's defense counsel questioned Wolchansky about his mental health, but Wolchansky falsely denied having mental health problems.

230.     The Commonwealth took no action to correct Wolchanksy's testimony.

231.     Documents in the Commonwealth's possession *at the time of trial, which were not disclosed to trial counsel*, would have effectively impeached Wolchansky and shown his testimony to be untruthful.

232.     The process of the PCRA uncovered documents that show Wolchansky's mental health problems were well documented at the time of Ogrod's second trial, and were persistent, severe, and, at times, psychosis-inducing.  The documents establish that Wolchansky's ability to perceive and truthfully and accurately recount information was compromised.

233.     In the DAO trial file, a handwritten note authored by ADA Rubino stated that in 1989, "Jason Banachowski" was taking "Medication – Melaril" (an antipsychotic drug widely used at the time to treat schizophrenia and psychosis) and was suffering from "paranoia – hearing voices from cocaine."

234.     The following documents were also found in other DAO files in the Commonwealth's possession that were never disclosed to Mr. Ogrod's trial counsel:

- A Mental Health Evaluation for Wolchansky dated July 26, 1989, diagnosing him with Mixed Personality Disorder with Borderline and Anti-Social

Features, primary and severe substance dependence problems, and possibly a Bipolar or Cyclothymic Disorder, which was difficult to assess given his lengthy poly-substance dependence.

- A document entitled Intake Health Information for PPS Staff, dated December 20, 1994, documenting Wolchansky's self-report that he had "a history of serious mental illness" and/or "received outpatient or inpatient mental health treatment" and recommending him for mental health placement.

- A handwritten letter from "[Assistant District Attorney] Lynn" Nichols to "Will" [Kushto] dated October 14, 1994 requesting that Wolchansky's case be "specially assigned" because the defendant would be presenting "a bogus mental health defense (i.e. schizophrenia)" and the public defender representing Wolchansky would be presenting "medical records and a doctor to testify that [Wolchansky] is being treated for schizophrenia."

- A memorandum dated January 27, 1995 from ADA Wilfred B. Kushto to ADA Kendall Zylstra specially assigning ADA Zylstra to prosecute *Commonwealth v. Jay Wolchansky* (CP-9408-0378) and asking him to inquire about an insanity defense, to subpoena Wolchansky's *crimen falsi* quarter session files, and to review the law on diminished capacity.

- A Presentence Report for Wolchansky dated April 24, 1995 listing his extensive history of *crimen falsi* convictions beginning at fourteen years of age, his mental health history and his history of abusing drugs and alcohol.


### Hall's History of "Cooperation"

235.     The Philadelphia DAO and District Attorneys' Offices in surrounding counties

used Hall as a "cooperator" in twelve separate homicide cases spanning from 1983 to 1997,

including nine homicide prosecutions in Philadelphia County.

236.     The DAO files reviewed by the CIU and Mr. Ogrod's counsel contain documents

showing the DAO was aware of Hall's involvement in all of these cases at the time he was

involved in the prosecution of Mr. Ogrod.

237.     Handwritten notes found in the DAO box for the prosecution of Herbert Haak and

Richard Wise set forth a list of eight cases in which Hall served as a cooperating witness for the

prosecution:

- Com. v. Allen, Cohen, Hinton, Rice & Turner – Nov. 1976 – Buck County, Conviction Invol. Deviate Sex. Int., Consp.
- Com. v. ? (Daniel Favaroso is victim) – Sept. 1979. Bucks County Invol. Dev. Sex. Int.
- Com. v. Feflie – Dec. 1987. Northampton County Robbery (Bank)
- Com. v. Jerick, Valez, VonStuden – Mar. 1988. Northampton County Armed Escape, Conspiracy
- Com. v. [Ernest] Privolos – Jan. 1990. Montgomery County, Murder, Robbery.
- State v. Dirago Ferrante – Apr. 1991. Attorney General N.J. Murder, Kidnap
- Com. v. [David] Dickson – Nov. 1995. Phila County Murder, Robbery
- Com. V [Thomas] Deblase – April 1993. Mont Co. Conviction Murder (only testified at suppression, not trial)

238.    In the DAO boxes for Jean Claude Hill, two pages of handwritten notes labeled

"John Hall," state under the heading "6 times go't [*sic*] wit," with a notation on the side "All

guilty," list the same first six cases as the note from the DAO boxes in Haak and Wise, *supra*:

- Bucks Co – 1976 – sex [illegible] rape
- Bucks Co – 1979 – [illegible] rape
- Northampton Co – '87 – Serial Bank Robber
- Northampton Co –'87 – 4 people shotgun in jail
- Mont. Co – Jan '90 – murder.
    – Incident Oct '86
    – C v. Ernest Privolos
- Bucks Co—Burlington Co. NJ
    – State Attorney General.
    – State v Michael Dirago
    – April '91

239.    Under the heading "Homicide Phila Police" this same document lists:

- C v. Michael Myers & Joe Myers, '86 ADA Carolyn Short
- Oct. 1983 — C v. Irwin Fester — Barbara Christie, 3rd degree plea
- [illegible] 1983 — C v. Anthony Bells — Phila 1st degree murder

240.    Under the heading "Phila Non-Homicide" these notes document that information

from Hall allowed for the arrest of David Frattaic for auto theft in December of 1982 by

Detective Ed Gaugin from the Major Crimes Auto Squad and an FBI agent.

241.    In addition to the cases listed in these notes, Hall also provided information and/or testified in the cases of Raymond Martorano in Philadelphia County, Herbert Haak and Richard Wise in Philadelphia County, Michael (Richard) Dirago in Bucks County, Tremayne Smith in Philadelphia County, and Jean Claude Pierre Hill in Philadelphia County.  Most of the cases in which Hall attempted to provide information were high profile cases, well-covered by the media.

242.    An August 7, 1996 letter from Wolchansky to Hall, indicates that Hall and Wolchansky kept in touch on the status of Mr. Ogrod and Dickson.  It also indicates that Hall and Wolchansky were communicating to each other through Phyllis and Wolchansky's daughter Heather.  On August 19, 1996, Wolchansky was interviewed about Mr. Ogrod and then testified in Mr. Ogrod's trial on October 4, 1996.

243.    None of this information was provided to trial counsel or presented to the jury that convicted and sentenced Mr. Ogrod to death.

**Ogrod's Mother**

244.    At the time of Mr. Ogrod's trials, the Commonwealth was in possession of documents showing Mr. Ogrod's mother, Olga Ogrod, believed her son was innocent.

245.    The DAO's file for Mr. Ogrod's case contained a letter from the Deputy General Counsel for the Governor to the Philadelphia DAO, including materials Olga Ogrod submitted to the Governor's Office in September 1992 (a little over a year prior to her death), proclaiming her son's innocence, explaining his mental infirmities and the mistreatment he suffered at the hands of interrogating detectives, and pleading for his release.

246.    The file also included a second letter from ADA Casey to the Governor's counsel, acknowledging receipt of these materials.

247.     Mr. Ogrod's mother died in1993 and before the second trial.

### *NOLLE PROSSE* **OF ALL CHARGES**

248.     Upon completion of its thorough investigation of this matter and in its February 28, 2020 Answer to Mr. Ogrod's Petition for Post Conviction Relief, the CIU ultimately found that Mr. Ogrod was likely innocent and his trial was fundamentally unfair and that "Ogrod is entitled to relief based on the due process violations, the *Brady* violations and the *Napue* violations [...]. His trial was also marred by many additional errors which rendered it fundamentally unfair and resulted in his wrongful conviction."

249.     The CIU also found that no credible evidence linked Mr. Ogrod to the crime and "In this case and several others involving false confessions obtained by Defendants Devlin and Worrell, the Commonwealth apparently lost sight of the fact that ours is an accusatorial and not an inquisitorial system of justice and that tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." (internal quotations and citations omitted.)

250.     The CIU continued: "In light of what credible medical science has told us about what caused Barbara Jean's death and the unreliability and sheer falsity of the Devlin Confession and the Wolchansky Confession, there exists no credible evidence to prove Ogrod was the person who murdered Barbara Jean."

251.     The CIU concluded: "At trial, Ogrod found himself adrift in a perfect storm of unreliable scientific evidence, prosecutorial misconduct, *Brady* violations and false testimony. As a result, Ogrod was wrongfully imprisoned for nearly three decades on death row - and all agree his incarceration constitutes cruel and unusual punishment.  Ogrod is likely innocent, and

his continued incarceration represents an ongoing miscarriage of justice.  The Commonwealth urges this Court to grant Ogrod relief and vacate his conviction and sentence."

252.   On June 5, 2020, Judge Shelley Robins New granted Mr. Ogrod's Post Conviction Relief Act Petition and granted bail.

253.   On June 10, 2020, and the Commonwealth *nolle prossed* the case.

## POLICIES AND PRACTICES IN THE CITY OF PHILADELPHIA

254.   The Philadelphia Police Department's pattern and practice of unconstitutional misconduct in homicide investigations, including the coercion of confessions and suggestion of false statements from witnesses, and the suppression of exculpatory and inconsistent evidence dates back to at least the 1970's and continued beyond the timeframe that the individual Defendants' investigated and prosecuted Mr. Ogrod.

255.   From at least the 1970's, and continuing well beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Ogrod, the City of Philadelphia had in force and effect policies, practices, and customs of unconstitutional misconduct in homicide investigations, including but not limited to using coercive techniques in interviews to obtain false and misleading statements from witnesses, fabricating inculpatory statements from witnesses and evidence, coercing and suggesting false identifications of suspects through the use of unconstitutional identification procedures, withholding exculpatory and inconsistent evidence, ignoring eyewitness interviews, and fabricating incriminating statements from witnesses by feeding details about the crime to the witnesses.

256.   At the time of the investigation and prosecution of Mr. Ogrod, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to make false statements by witnesses appear true and reliable, including but not limited to:

providing a witness with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading investigative steps to make statements appear more credible; selectively documenting witness statements and not the preceding interrogation, interview, preparation, or rehearsal; selectively recording witness' interviews; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words, even when paraphrased or altered.

257.    At the time of the investigation and prosecution of Mr. Ogrod, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to coerce false statements, including but not limited to: subjecting witnesses to needlessly prolonged interrogations and interviews; isolation; making promises, regardless of their truthfulness; threatening charges for unrelated misconduct; offering assistance in unrelated criminal matters, including pending or recently dismissed criminal charges; interviewing witnesses while they are under the influence of mind-altering narcotics that made them more susceptible to coercion and the drugs' mind-altering effects; and asserting that the witness will benefit in some way from making a statement that assists the police, and suffer some sort of disadvantage if they do not assist.

258.    At the time of the investigation and prosecution of Mr. Ogrod, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to suppress or withhold exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements to prosecutors about the existence of evidence; failing to provide complete homicide files to prosecutors; coercing witnesses into keeping exculpatory and inconsistent information from prosecutors; refusing to testify at trial; discarding or deleting exculpatory and inconsistent information from

homicide files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from homicide files; farming out portions of Homicide investigations to police officers outside the Homicide Unit or other detectives assigned to the Homicide Unit so as to maintain a lack of evidence of their participation; and threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying.

259.    Furthermore, at the time of the investigation and prosecution of Mr. Ogrod, the Philadelphia District Attorney's office had a policy, practice, or custom of withholding exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements about the existence of evidence; allowing witnesses to provide false testimony; discarding or deleting exculpatory and inconsistent information from their files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from their files.

260.    At the time of the investigation and prosecution of Mr. Ogrod's case, the Philadelphia Police Department had a policy, practice, or custom of detaining, arresting, threatening, and interrogating purported witnesses in criminal investigations without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, or for material benefits.  These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

261.    At the time of the investigation and prosecution of Mr. Ogrod's case, the Philadelphia Police Department had a policy, practice, or custom of maintaining a deliberately biased Internal Affairs Division that exonerated police officers and detectives, including Homicide Detectives, regardless of the evidence of misconduct.

262.    At the time of the investigation and prosecution of Mr. Ogrod's case, the
Philadelphia Police Department had a policy, practice, or custom involving the intentional use of
untruthful affidavits of probable cause to support arrest warrants that, in violation of their
constitutional duties, failed to recite the totality of circumstances, including exculpatory
information, and cited fabricated evidence, statements from coerced witnesses, omitted mention
of credible exculpatory witness statements, and mischaracterized the nature of unconstitutional
identifications.  The City of Philadelphia failed to train and supervise its officers and detectives
to deter or end this policy, practice, and custom.

263.    These practices are well-known to the City of Philadelphia and its policymakers
with respect to criminal investigations and prosecutions as a result of newspaper investigations,
including the Philadelphia Inquirer's Pulitzer Prize winning reporting in 1977-78, governmental
investigations, including the Philadelphia Police Department's 39th District Corruption Scandal
in the 1990's, complaints from the public, complaints from attorneys, complaints from
whistleblowers, prior litigation, including employment complaints to the EEOC, and internal
police investigations.

264.    The Philadelphia Police Department was deliberately indifferent to officers'
misconduct and credible complaints to the Police Department's internal compliance department
were disregarded.

265.    Various cases involving the exoneration of individuals accused of murder,
individuals yet to be exonerated, and individuals who were in fact guilty demonstrate that this
misconduct was pervasive within the City of Philadelphia in both the Police Department and
District Attorney's office both before and after it investigated and prosecuted Mr. Ogrod, and,
upon information and belief, the misconduct described in this Complaint was tacitly, if not

expressly, permitted by, committed with, or deliberately ignored when committed in the presence

of Homicide Unit, Philadelphia Police Department, and/or District Attorney supervisors.

266.    In addition to the specific instances of similar misconduct detailed above in

Paragraphs 222-227, the convictions that later resulted in exonerations demonstrate the rampant

patterns, practices, and customs of official misconduct within the City of Philadelphia Police

Department and a prior administration of its District Attorney's Office:

a.   *Commonwealth v. Antonio Martinez* – This matter was investigated in 1985
     and resulted in the exoneration of Mr. Martinez after more than 30 years of
     incarceration.  It was determined that during his 1990 trial the Philadelphia
     Police and District Attorney's withheld information in their files which were
     later determined to contain numerous pieces of evidence implicating another
     suspect in the murder, including an eyewitness who informed police that
     another individual committed the murders.;

b.   *Commonwealth v. Raymond Carter* – This matter, which was investigated
     from 1986 until his conviction in 1988, resulted in the exoneration of Mr.
     Carter after former police officer Thomas Ryan was indicted in February 1995
     on federal corruption charges.  A Philadelphia judge ordered a new trial
     because the prosecution's star witness had been paid $500 by then-officer
     Ryan to testify against Carter.  The City of Philadelphia paid a "churchgoing
     grandmother" a significant settlement after she sued alleging Ryan helped
     frame her and send her to prison for 3 years.  In 1996, the Philadelphia
     Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated
     evidence because Ryan wanted the overtime compensation often available to
     officers in murder investigations.;

c.   *Commonwealth v. Messrs. Gilyard & Wells* – This matter, which was
     investigated in August 1995 and resulted in the exoneration of the defendants
     after periods of wrongful incarceration, involved the fabrication and coercion
     of witness statements, garnering of false identifications based on suggestive
     police behavior, the suppression of exculpatory evidence and the submission
     of untruthful affidavits of probable cause when seeking arrest warrants.;

d.   *Commonwealth v. Donald Ray Adams* – Mr. Adams' case was investigated
     beginning in 1990 until his conviction in 1992.  Police ignored the physical
     description of the suspect provided by numerous eyewitnesses and instead
     opted to pressure and coerce an eyewitness with a crack cocaine addiction and
     criminal history.  Mr. Adams' was eventually granted a new trial and a jury
     returned a verdict of not guilty in 2011.;

  e. *Commonwealth v. Jimmy Dennis* – Mr. Dennis' case was investigated from 1991 until he was sentenced to death in 1992. Nearly 25 years later, the United States Court of Appeals for the Third Circuit, sitting *en banc* vacated Mr. Dennis' conviction, holding that constitutional violations by Philadelphia Police Department Homicide detectives had undermined the fairness of Mr. Dennis' trial. Philadelphia Police Department Homicide coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and suppressing material evidence, employed unlawful investigate techniques, presented false testimony, and denied Mr. Dennis due process of law and a fair trial.;

  f. *Commonwealth v. Percy St. George* – Mr. St. George's case was investigated from 1993 until 1994.  A Philadelphia Police Department Homicide Detective obtained a statement from a man who signed another person's name because of his fugitive status. As the trial approached, the Homicide Detective coerced the person whose named appeared in the signature to provide and sign a fabricated statement and to falsely identify Mr. St. George from an overly suggestive sham photo array. Upon further investigation, evidence suggested the homicide detectives coerced the witnesses into providing false statements and false identifications. The Detectives pleaded their Fifth Amendment right against self-incrimination rather than testify as to how they obtained the statements and identification.; and

  g. *Commonwealth v. Andrew Swainson* – In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley. Presley was an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m.  The prosecution dropped charges against Presley three weeks later.  Det. Santiago soon took a statement from Presley.  Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, *all seven photos that Det. Santiago showed Presley were of Swainson*.  Presley explained that he only testified against Presley because he was coerced with threats of being charged for a separate drug crime.  (Presley was charged under a different name, and the Commonwealth never disclosed the matter Commonwealth v. Kareem Miller, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson was exonerated in 2020.

267. As a result of the pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Ogrod was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of NAACP v. City of Philadelphia requiring wide-ranging reforms in the Philadelphia Police Department and, in

particular, providing for specific limitations on the investigative practices and policies of the Philadelphia Police Department.

268.     During the 1980's and 1990's, and concurrent with the time of the investigation of this case by the Philadelphia Police Department, there was within the Department a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's, the United States District Court of Eastern District of Pennsylvania issued orders enjoining the Philadelphia Police Department from engaging in these practices:

    a. *Cliett v. City of Philadelphia* (1985): consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1500 individuals in drug sweeps.;

    b. *Spring Garden Neighbors v. City of Philadelphia* (1985): enjoining police sweeps of Latinos in the Spring Garden neighborhood as a part of a Homicide Unit investigation.; and

    c. *Arrington v. City of Philadelphia* (1988): enjoining unconstitutional stops, detentions and searches of Black men during the "Center City Stalker" investigation.

269.     At the time of the investigation and prosecution of Mr. Ogrod, the Philadelphia Police Department had a practice, policy, and/or custom of:

    a. engaging in unlawful interrogations of witnesses, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, coercing false identifications through the use of unconstitutional identification procedures, coercing false confessions through the use of unconstitutional conduct and procedures, and failing to disclose exculpatory statements and evidence;

    b. failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

    c. failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

51

    d.   ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police interrogations, searches and arrests, coercion of witnesses and suspects, falsifying and fabricating evidence, coercion of false identifications through the use of constitutionally defective identification procedures coercion of false confessions through the use of unconstitutional conduct and procedures, and suppression of exculpatory evidence;

    e.   failing to properly sanction or discipline Philadelphia Police Department officers, who are aware of and conceal or aid and abet violations of constitutional rights of individuals by other Philadelphia Police Department officers, thereby causing and encouraging Philadelphia Police, including the individual Defendants in this case, to violate the rights of citizens such as Mr. Ogrod.

270.    At the time of the investigation and prosecution of Mr. Ogrod, and for many years before and thereafter, the Philadelphia Police Department and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers.  The Internal Affairs Division of the Philadelphia Police Department has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

    a.   the Philadelphia Police Department's internal investigatory process was riddled with excessive and chronic delays in resolving disciplinary complaints;

    b.   the Philadelphia Police Department lacked consistent, rational, and meaningful disciplinary and remedial actions;

    c.   the Philadelphia Police Department failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

    d.   the Philadelphia Police Department's internal investigatory process fell below the accepted standards and practices and was arbitrary and inconsistent;

    e.   the Philadelphia Police Department discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to their number of violations;

    f.   the conduct of Internal Affairs investigations demonstrated that the Philadelphia Police Department internal affairs personnel were not adequately

trained and supervised in the proper conduct of such investigations;

g.  a global analysis of Internal Affairs' investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.  the Philadelphia Police Department lacked an effective early warning system to identify, track, and monitor "problem" officers;

i.  Internal Affairs failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, and interviews that were conducted were below acceptable standards of police practices and failed to address key issues; and

## DAMAGES

271.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Ogrod to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve over 28 years in prison for a crime he did not commit.

272.    As a direct result of Defendants' conduct and omissions, Mr. Ogrod sustained injuries and damages, including loss of freedom for more than 28 years, loss of his youth, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

273.     As a direct result of Defendants' conduct and omissions, Mr. Ogrod sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

274.     As a direct result of Defendants' conduct and omissions, Mr. Ogrod sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## COUNT I
### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments
### (Against all Individual Defendants)

275.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

276.     The individual Defendants, acting with malice individually and in concert, and knowing that probable cause did not exist to prosecute Mr. Ogrod for Barbara Jean's murder, intentionally caused Mr. Ogrod to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Ogrod's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

277.     The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

278.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Ogrod's clearly established constitutional rights.  No reasonable officer in 1992 would have believed this conduct was lawful.

279.     The prosecution finally terminated in Mr. Ogrod's favor on June 10 2020, when

the Commonwealth *nolle prossed* the case.

280.     The acts and omissions by the individual Defendants described in the preceding

paragraphs were the direct and proximate cause of Mr. Ogrod's injuries as these Defendants

knew, or should have known, that their conduct would result in the wrongful arrest, prosecution,

conviction, and incarceration of Mr. Ogrod.

<u>**COUNT II**</u>
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation (Against All Individual Defendants)**

281.     The preceding paragraphs are incorporated by reference as though fully set forth

herein.

282.     The individual Defendants, acting individually and in concert, and within the

course and scope of their employment with the Philadelphia Police Department deprived Mr.

Ogrod of his clearly established constitutional right to due process of law and to a fair trial by

fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain

inculpatory witness statements, including without limitation: the false statement of Wolchansky;

Mr. Ogrod's fabricated confession; and fabricating evidence that the lateral pull-down weight bar

was used in the murder.

283.     The individual Defendants deprived Mr. Ogrod of his right to a fair trial by

withholding material exculpatory and impeachment evidence, including without limitation,

withholding information regarding the circumstances of Mr. Ogrod's interrogation and evidence

of the cause of death of Barbara Jean.

284.     The individual Defendants deprived Mr. Ogrod of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to obtain complete witness statements and conduct a complete investigation of the Ogrod residence.

285.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Ogrod's clearly established constitutional rights.  No reasonable officer in 1992 would have believed this conduct was lawful.

286.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Ogrod's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Ogrod's wrongful arrest, prosecution, conviction, and incarceration.

<u>COUNT III</u>
**42 U.S.C. § 1983 Violation of Plaintiff's Right Against Self-Incrimination in Violation of
the Fifth and Fourteenth Amendments
(Against Defendants Devlin and Worrell)**

287.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

288.     Although Mr. Ogrod never actually confessed to Barbara Jean's murder, Defendants Devlin and Worrell coerced Mr. Ogrod into signing and initialing a made-up statement handwritten by the detectives, which Defendants later misrepresented as a voluntary confession.

289.     The circumstances of Mr. Ogrod's interrogation were highly coercive, including but not limited to the fact that the defendants isolated Mr. Ogrod, failed to inform him of his

Miranda rights, ignored his requests to have a lawyer present, interrogated him for hours, verbally abused him, and threatened him with physical violence.

290.     Ultimately, Mr. Ogrod's coerced statement was used against him at both of his trials, thereby violating Mr. Ogrod's right against self-incrimination.

291.     As a direct and proximate result of Defendants' actions, Mr. Ogrod was wrongly prosecuted, detained, and incarcerated for over 28 years and suffered other injuries and damages as set forth above.

### COUNT IV
### 42 U.S.C. § 1983 Civil Rights Conspiracy
### (Against All Individual Defendants)

292.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

293.     The individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Ogrod of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial.

294.     In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.  Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

    b.  Coercing and fabricating Mr. Ogrod's false confession;

    c.  Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

      d.   Wrongfully prosecuting Mr. Ogrod while knowing that they lacked probable cause; and

      e.   Committing perjury during hearings and trials.

295.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Ogrod's injuries.  Defendants knew, or should have known, that their conduct would result in Mr.Ogrod's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT V**
**42 U.S.C. § 1983 Failure to Intervene**
**Against All Individual Defendants**

296.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

297.    By their conduct and under color of state law, the individual Defendants, acting within the course and scope of their employment with the Philadelphia Police Department, had opportunities to intervene on behalf of Mr. Ogrod to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

298.    These Defendants' failures to intervene violated Mr. Ogrod's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 1992 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or

impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Ogrod to be arrested and prosecuted without probable cause, were lawful acts.

299.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Ogrod's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Ogrod's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VI
### 42 U.S.C. § 1983 Supervisory Liability Claim
### (Against Defendant Nodiff)

300.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

301.    Defendants, including detectives Devlin and Worrell acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Nodiff, both in this case and as a matter of practice and custom.

302.    Defendant Nodiff acted recklessly and with deliberate indifference to Mr. Ogrod's constitutional rights by failing to adequately train, supervise, and discipline the Philadelphia Police Department Homicide detectives assigned to this investigation, including Defendant detectives Devlin and Worrell, thereby allowing and causing these detectives to deprive Mr. Ogrod of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial.

303.     Defendant Nodiff was both personally involved in the investigation of Mr. Ogrod and directly supervised the investigative acts taken by the Homicide detectives, including Defendants Devlin and Worrell.

304.     The reckless and deliberately indifferent conduct of Defendant Nodiff violated his clearly established duty, in 1992, to supervise the defendant detectives, and no reasonable police supervisor in 1992 would have believed that the reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

305.     Defendant Nodiff's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Ogrod's injuries.  Defendant Nodiff knew, or should have known, that his conduct would result in Mr. Ogrod's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VII
### 42 U.S.C. § 1983 Supervisory Liability Claim
### (Against Defendant Snyder)

306.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

307.     Defendants, including detective Rocks acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Snyder, both in this case and as a matter of practice and custom.

308.     Defendant Snyder acted recklessly and with deliberate indifference to Mr. Ogrod's constitutional rights by failing to adequately train, supervise, and discipline the Philadelphia Police Department Homicide detectives assigned to this investigation, including Defendant detective Rocks, thereby allowing and causing the detectives to deprive Mr. Ogrod of

his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial.

309.    Defendant Snyder was both personally involved in the investigation of Mr. Ogrod and directly supervised the investigative acts taken by the Homicide detectives, including Defendant Rocks.

310.    The reckless and deliberately indifferent conduct of Defendant Snyder violated his clearly established duty, in 1992, to supervise the defendant detectives, and no reasonable police supervisor in 1992 would have believed that the reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

311.    Defendant Snyder's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Ogrod's injuries.  Defendant Snyder knew, or should have known, that his conduct would result in Mr. Ogrod's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VIII
### 42 U.S.C. § 1983 Supervisory Liability Claim
### (Against Defendant Washlick)

312.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

313.    Defendants, including detectives Devlin, Worrell, Rocks and sergeants Snyder and Nodiff, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Washlick, both in this case and as a matter of practice and custom.

314.     Defendant Washlick acted recklessly and with deliberate indifference to Mr. Ogrod's constitutional rights by failing to adequately train, supervise, and discipline the Philadelphia Police Department Homicide detectives and sergeants assigned to and/or involved in this investigation, including detectives Defendants Devlin, Worrell, and Rocks and sergeants Defendants Snyder and Nodiff, thereby allowing and causing these officers to deprive Mr. Ogrod of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial.

315.     Upon information and belief, Defendant Washlick was both personally involved in the investigation of Mr. Ogrod and directly supervised the investigative acts taken by the Homicide detectives and sergeants, including Defendants Devlin, Worrell, Rocks, Snyder, and Nodiff.

316.     The reckless and deliberately indifferent conduct of Defendant Washlick violated his clearly established duty, in 1992, to supervise the defendant detectives and sergeants, and no reasonable police supervisor in 1992 would have believed that the reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

317.     Defendant Washlick's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Ogrod's injuries.  Defendant Washlick knew, or should have known, that his conduct would result in Mr. Ogrod's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT IX**
**42 U.S.C. § 1983 Municipal Liability Claim**
**(Against Defendant City of Philadelphia)**

318.     The preceding paragraphs are incorporated by reference as though fully set forth

herein.

319.     The City of Philadelphia, by and through its final policymakers, had in force and

effect during the time of Mr. Ogrod's wrongful arrest and conviction, and for many years

preceding and following this investigation a policy, practice, or custom of unconstitutional

misconduct in homicide and other criminal investigations, including in particular the use of

coercive techniques in interviews and interrogations to obtain confessions; the fabrication of

inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and

arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of

exculpatory evidence.

320.     Final policymakers for the City of Philadelphia had actual or constructive notice

of these practices, policies, and customs, but repeatedly failed to make any meaningful

investigation into charges that homicide detectives were using coercive techniques in interviews

and interrogations to obtain confessions; withholding exculpatory evidence; fabricating

inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses,

suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to

take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

321.     Mr. Ogrod's injuries and damages were further proximately caused by policies

and practices on the part of policymakers with responsibility of administration of the District

Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow

witness to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

322.     The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

323.     Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Ogrod's false, coerced, and fabricated confession, causing his arrest, prosecution, and over 28 years of incarceration, as well as all the other injuries and damages set forth above.

### COUNT X
**Malicious Prosecution Under Pennsylvania State Law**
**(Against All Individual Defendants)**

324.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

325.     The individual Defendants initiated or continued proceedings against Mr. Orgrod, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Mr. Ogrod's favor on June 10, 2020 when the Commonwealth *nolle prossed* the case.

326.     As a result of this malicious prosecution, Mr. Ogrod sustained the injuries and damages set forth above.

## PUNITIVE DAMAGES

327.    The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

328.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

329.    As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

(a)    That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

(b)    That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

(c)    A declaratory judgment that the practices and policies complained of are unconstitutional;

(d)    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e)    For such other and further relief as appears reasonable and just.

MARRONE LAW FIRM, LLC

By:    s/ Joseph M. Marrone
Joseph M. Marrone, Esquire
Attorney for Plaintiff
200 South Broad Street, Suite 200
Philadelphia, PA  19102
(215) 732-6700
jmarrone@marronelaw.com
PA Atty ID# 64920

Date: June 2, 2021