IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WALTER OGROD | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL. | : | NO. 21-2499 |

## <u>MEMORANDUM</u>

**Padova, J.**                                                                                  **April 12, 2022**

Plaintiff Walter Ogrod commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant the City of Philadelphia (the "City") and several individual Philadelphia police officers after Plaintiff was sentenced to death and spent twenty-eight years in prison in connection with a murder for which he was subsequently exonerated.   Plaintiff alleges that his conviction was based on a coerced confession, fabricated evidence, and the withholding of exculpatory evidence. Presently pending before the court are two Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), one filed by the City and Defendants Detective Edward Rocks, Sergeant Laurence Nodiff, and Lieutenant Joseph Washlick (collectively, the "City Defendants"), and one filed by Defendants Detective Martin Devlin and Detective Paul Worrell (collectively, the "Devlin Defendants").   For the following reasons, we grant both Motions in part and deny both Motions in part.

## I.      BACKGROUND

The Complaint alleges the following facts.   On July 12, 1988, the body of four-year-old Barbara Jean Horn was found in a cardboard box, 1000 feet from her home at 1409 St. Vincent Street, at the curb next to some trash cans.   (Compl. ¶ 18.)   A subsequent autopsy determined that Barbara Jean had died of cerebral injuries.   (Id. ¶ 37.)   Barbara Jean's stepfather, John Fahy, told police that he last saw Barbara Jean alive at the Fahy residence at 7245 Rutland Street that same

afternoon.  (Id. ¶ 20.)   At the time of the murder, Ogrod lived at 7244 Rutland Street, directly across the street from the Fahy residence.  (Id. ¶ 27.)   At least five eyewitnesses gave police descriptions of a man they had seen carrying and/or dragging a box through the neighborhood. (Id. ¶ 23.)   Not one eyewitness identified Ogrod as the man with the box.   (Id. ¶ 34.)   Likewise, a tip line and significant media coverage never led to any evidence the implicated Ogrod in the crime.   (Id. ¶¶ 46-48.)   The investigation into Barbara Jean's murder went cold in January of 1990.  (Id. ¶ 47.)

In 1992, there was a Special Investigations Unit within the Homicide Unit of the Philadelphia Police Department.  (Id. ¶ 53.)   Defendant Nodiff was a Sergeant in that Unit and reported to Defendant Washlick, his Liuetenant.  (Id. ¶ 53.)   In early 1992, Nodiff assigned the Devlin Defendants to reinvestigate Barbara Jean's unsolved murder.  (Id. ¶ 54.)   Defendant Rocks had previously been involved in an investigation of a 1996 murder that had occurred in Ogrod's basement, for which an acquaintance of Ogrod's was convicted.  (Id. ¶¶ 56-58.)   The police file for that investigation included a photo of Ogrod's basement that depicted a weight machine with a lateral pull-down weight bar.  (Id. ¶ 60.)

On April 5, 1992, Ogrod voluntarily appeared at the police station, without an attorney, "to be interviewed ostensibly as a witness" in connection with Barbara Jean's murder.  (Id. ¶ 63.) The Devlin Defendants conducted an unrecorded interview, after which they produced what they said was a "verbatim hand-written transcription of Mr. Ogrod's confession to the murder of Barbara Jean."  (Id. ¶ 65.)   In the confession, Ogrod stated, inter alia, that he had sexually assaulted Barbara Jean in the basement of his home and then killed her by hitting her in the head with a pull-down bar from his weight set.  (Id. ¶¶ 66-68.)

Ogrod was tried before a jury in 1993.  (Id. ¶ 89.)   Prior to the trial, Ogrod moved to

suppress his April 5, 1992 confession, claiming that it was involuntary and coerced, but that motion was denied after a hearing.  (Id. ¶¶ 80, 89.)   At trial, during which Ogrod testified in his own defense, the only evidence directly linking Ogrod to the murder was his April 5 confession, which Ogrod contested in his testimony.  (Id. ¶¶ 93, 97.)   On November 4, 1993, after "multiple" days of deliberations, the jury returned with a verdict slip marked not guilty.  (Id. ¶ 99.)   However, before the verdict was read aloud, one juror stated that he did not agree with the verdict and, as a result, the judge declared a mistrial.   (Id. ¶ 101.)

Ogrod was tried a second time in 1996.   (Id. ¶ 108.)   The only significant new evidence offered at the new trial was the testimony of Jay Wolchansky, who had been in prison with Ogrod between the first and second trials and testified that Ogrod had confessed to him that he had committed the murder.  (Id. ¶¶ 120-21.)   Ogrod did not testify in his own defense at the second trial.  (Id. ¶ 123.)   The prosecution asserted in its closing argument that Wolchansky had no deal with the Commonwealth in exchange for his testimony.  (Id. ¶ 124.)   The jury in the second trial convicted Ogrod of first-degree murder and attempted involuntary deviate sexual intercourse, and Ogrod was sentenced to death.    (Id. ¶ 126.)

In 2005, Ogrod filed a petition seeking relief pursuant to the Post Conviction Relief Act ("PCRA").  (Id. ¶ 127.)   In the PCRA proceeding, Ogrod raised claims of actual innocence, Brady/Napue violations, and ineffective assistance of counsel.  (Id. ¶ 128.)   In February of 2018, the case was transferred to the Conviction Integrity Unit of the District Attorney's Office (the "CIU") for review and investigation of Ogrod's actual innocence claim.   (Id. ¶ 138.)   In October of 2018, the CIU agreed to conduct DNA testing of all relevant and available evidence.  (Id. ¶ 139.)   The parties also reached an agreement for Ogrod's counsel to review the Commonwealth's files for Ogrod's case, as well as files for cases involving jailhouse informant Wolchansky.  (Id.

¶ 140.)

Ultimately, the only DNA evidence that was found suitable for testing was a wash sample recovered from Barbara Jean's autopsy table, and it produced a full male DNA profile that did not match Ogrod.   (Id. ¶¶ 144-47.)   In addition, new experts opined that Barbara Jean's death had not been caused by a head injury, and that the injuries to Barbara Jean's head were not inflicted by the weight bar recovered from Ogrod's basement.   (Id. ¶¶ 154, 157, 162, 164-65.)   Defense counsel also obtained a sworn statement from John Hall, a "notorious jailhouse cooperator," who attested that he had provided Wolchansky with all of the details of Ogrod's purported confession to Wolchansky.   (Id. ¶¶ 196, 203.)   Although Hall is now deceased, the CIU subsequently interviewed Hall's wife and reviewed letters written by Hall to his wife, which revealed that Hall had compiled information to fabricate the substance of Ogrod's purported confession to Wolchansky.   (Id. ¶¶ 197-201.)

In 2020, the District Attorney of Philadelphia joined Ogrod's petition to the Court of Common Pleas for Ogrod's release and ultimately requested that the court *nolle prosse* all charges. (Id. ¶ 4.)   Ogrod was discharged from the custody of the Pennsylvania Department of Corrections on June 5, 2020, and he was fully exonerated five days later.   (Id. ¶ 10.)   Ogrod then commenced the instant action against the City and the officers involved in the 1992 investigation of his case.

The Complaint contains ten Counts, the first nine of which are grounded in 42 U.S.C. § 1983.   Count I asserts a claim against all of the individual Defendants for malicious prosecution in violation of the Fourth and Fourteenth Amendments.   Count II asserts a claim against all of the individual Defendants for deprivation of liberty without due process of law and denial of a fair trial.   Count III asserts a claim against the Devlin Defendants for violation of Plaintiff's right against self-incrimination in violation of the Fifth and Fourteenth Amendments.   Count IV asserts

a civil rights conspiracy claim against all of the individual Defendants.   Count V asserts a claim against all of the individual Defendants for failure to intervene.   Counts VI and VIII assert supervisory liability claims against Defendants Nodiff and Washlick.[1]   Count IX asserts a municipal liability claim against the City pursuant to Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).   Count X asserts a malicious prosecution claim against all of the individual Defendants pursuant to Pennsylvania state law.

## II.    LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)).   We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff.   DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011)). Legal conclusions, however, receive no deference, as the court is "not bound to accept as true a legal conclusion couched as a factual allegation."   Wood v. Moss, 572 U.S. 744, 755 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration

---

[1]   The Complaint includes a Count VII, which asserts a supervisory liability claim against Defendant Sergeant Robert Snyder.   According to the City Defendants, Snyder is deceased and has not been served.   No Motion has been filed on Snyder's behalf.   Consequently, we do not address Count VII any further.

in original) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).   The complaint must contain

"'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to

draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"   <u>Warren</u>

<u>Gen. Hosp.</u>, 643 F.3d at 84 (quoting <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir.

2009)).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully."   <u>Iqbal</u>, 556 U.S. at 678 (citing

<u>Twombly</u>, 550 U.S. at 556).   In the end, we will grant a motion to dismiss brought pursuant to

Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "to raise a right to relief

above the speculative level."   <u>Geness v. Admin. Off. of Pa. Cts.</u>, 974 F.3d 263, 269 (3d Cir. 2020)

(quoting <u>Twombly</u>, 550 U.S. at 555), <u>cert. denied</u>, 141 S. Ct. 2670 (2021).

## III.   DISCUSSION

Defendants have moved to dismiss most of the Counts of the Complaint for failure to state

a claim upon which relief can be granted pursuant to Rule 12(b)(6).   The individual Defendants

specifically argue, inter alia, that they are protected from liability for many of Ogrod's claims by

qualified immunity, that certain claims are barred by issue preclusion, and that the Complaint fails

to allege the personal involvement of certain Defendants and fails to allege facts to support

plausible claims of supervisory liability.   In addition, the City also argues that the municipal

liability claim against it should be dismissed insofar as it is premised on any underlying

constitutional violations that are fully dismissed against the individual Defendants.

Nine of the ten Counts in the Complaint are grounded on 42 U.S.C. § 1983, which

"provides remedies for deprivations of rights established in the Constitution or federal laws.

Section 1983 does not, by its own terms, create substantive rights."   <u>Kaucher v. Cnty. of Bucks</u>,

455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 145 n.3 (1979)).

6

Consequently, in order to state a claim for relief pursuant to § 1983, a plaintiff must allege that "the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States."  Id. (citing Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999), and Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)). It is also incumbent on the plaintiff to "identify the exact contours of the underlying right said to have been violated."  Berg v. Cnty. of Allegheny, 219 F. 3d 261, 268 (3d Cir 2000) (quotation omitted).

### A.   Malicious Prosecution - Counts I and X

Counts I and X of the Complaint assert that the individual Defendants are liable for malicious prosecution in violation of the Fourth and Fourteenth Amendments and Pennsylvania state law.   The Devlin Defendants argue that the malicious prosecution claims grounded on the Fourth Amendment and state law should be dismissed because they are entitled to qualified immunity, and the City Defendants argue that the Fourth Amendment and state law claims against Rocks, Nodiff, and Washlick should be dismissed because the Complaint fails to allege that those Defendants were personally involved in the alleged unconstitutional conduct.   With regard to the malicious prosecution claim grounded on the procedural due process clause of the Fourteenth Amendment, Defendants argue that they are entitled to qualified immunity because the law does not—and did not at the time of the alleged violations—recognize a malicious prosecution claim pursuant to the Fourteenth Amendment.

### 1.   Fourth Amendment and State Law

In order to state a § 1983 claim for malicious prosecution under the Fourth Amendment, a plaintiff must allege that "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without

7

probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007) (citation omitted). Under Pennsylvania law, a plaintiff must allege the first four elements, but not the fifth. Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 379 (E.D. Pa. 2018) (citing Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d Cir. 2000)). While malicious prosecution claims are most commonly associated with prosecutors, the law makes clear that police officers who influence or participate in a prosecutorial decision to institute criminal proceedings by concealing or misrepresenting material facts to district attorneys may also be liable for malicious prosecution. Halsey v. Pfeiffer, 750 F.3d 273, 297 (3d Cir. 2014) (citations omitted); Brooks v. Dooley, Civ. A. No. 16-6136, 2017 WL 2480734, at *3 (E.D. Pa. June 7, 2017) (recognizing that that police officer may be liable for malicious prosecution where they "knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion").

<blockquote>a. Qualified Immunity</blockquote>

The Devlin Defendants argue that they are entitled to qualified immunity on the Fourth Amendment and state law malicious prosecution claims. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009). Our determination as to whether government official is entitled to qualified immunity involves two inquiries: (1) whether the facts alleged in the Complaint "make out a violation of a constitutional right" and (2) whether that right "was clearly established at the time of [the] defendant's alleged misconduct."

<u>Montanez v. Thompson</u>, 603 F.3d 243, 250 (3d Cir. 2010) (quoting <u>Pearson</u>, 555 U.S. at 232). These two steps do not have to be considered in this order.   <u>Id.</u> (quoting <u>Pearson</u>, 555 U.S. at 236).

"[T]he clearly established right must be defined with specificity," rather than "'at a high level of generality.'"   <u>City of Escondido v. Emmons</u>, 139 S. Ct. 500, 503 (2018) (quoting <u>Kisela v. Hughes</u>, 5138 S. Ct. 1148, 1152 (2018)).   An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."   <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1153 (2018) (quoting <u>Plumhoff v. Rickard</u>, 573 U.S. 765, 778-79 (2014)).   While "there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate."   <u>Dist. of Columbia v. Wesby</u>, 138 S. Ct. 577, 590 (2018) (quotation omitted).   "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"   <u>City & Cnty. of San Francisco v. Sheehan</u>, 575 U.S. 600, 611 (2015) (alteration in original) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011)).

The Devlin Defendants argue that they are entitled to qualified immunity not because the Fourth Amendment and state law right to be free from malicious prosecution was not clearly established between 1992 (when they interrogated Ogrod) and 1996 (when Ogrod was convicted), but because the interrogation techniques and pressure that they allegedly used to obtain Ogrod's confession were not clearly prohibited in that time frame.   In this regard, they focus on the Complaint's allegations that they "confront[ed] [Ogrod] with pictures of Barbara Jean's body in the box, accusing him of having committed the murder, and, when he insisted he had nothing to do with it, repeatedly [told] him that he was mentally blocking any memory of the murder and they were only trying to help him remember."   (Compl. ¶ 94.)   They argue that there was no clearly

established law at the time of the interrogation that such techniques were improper and, thus, the use of such techniques did not render Ogrod's confession involuntary, such that it could not be used to establish probable cause for Ogrod's arrest and prosecution.   They therefore maintain that they are entitled to qualified immunity for claims grounded on their use of such techniques.

However, the Devlin Defendants ignore the Complaint's allegations that the confession was not only coerced and involuntary, but was actually entirely fabricated.   (See Compl. ¶ 282 (stating that Defendants "fabricat[ed] inculpatory evidence," including "Ogrod's fabricated confession").)   Indeed, the Complaint alleges that the Devlin Defendants had a "pattern and practice of eliciting false statements" from suspects.   (Id. ¶ 223.)   It further alleges that the details of the confession that they obtained from Ogrod were incompatible with the physical evidence in the case.   (See, e.g., id. ¶ 162 ("Barbara Jean's injuries were not compatible with being struck by the weight bar as described in the . . . confession"); id. ¶ 214 (stating that evidence that Ogrod's basement door was nailed shut was incompatible with Ogrod's confession that he entered and exited the basement through that door on the day of the murder); id. ¶ 182 (stating that "many of the facts of the . . . confession are demonstrably false").)   Moreover, the Complaint alleges that the CIU ultimately concluded that Ogrod's confession was a "sheer falsity."   (Id. ¶ 250.)

Accordingly, contrary to the Devlin Defendants' argument, they are not alleged to have engaged in malicious prosecution solely because they utilized certain disfavored interrogation techniques that may not have been sufficiently coercive to render Ogrod's confession involuntary and inadmissible.   Rather, they are alleged to have completely fabricated Ogrod's confession.   "It is self-evident that 'a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" Halsey, 750 F.3d at 293 (quoting Johnson, 477 F.3d at 82).   We therefore reject the Devlin

Defendants' argument that they should be afforded qualified immunity on Ogrod's Fourth Amendment and state law malicious prosecution claims because the Complaint does not allege that they engaged in conduct that was clearly prohibited.   Consequently, we deny their Motion insofar as they seek dismissal of those claims against them.

b.   Personal Involvement

The City Defendants argue that we should dismiss the Fourth Amendment and state law malicious prosecution claims against Rocks, Nodiff, and Washlick because the Complaint does not allege that these three individuals had personal involvement in the alleged malicious prosecution and merely pleads their liability by association.[2]   In order to state a claim against a defendant for a civil rights violation, a plaintiff must allege that the defendant had "personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."   Rode v. Dellaciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).   "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."   Id.   Moreover, any "[a]llegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity."   Id. (citations omitted).

Here, the Complaint alleges that Rocks was a detective with the Homicide Unit and/or Special Investigations Unit that investigated Ogrod's case in 1992; that Nodiff was a sergeant and supervisor in those units; and that Washlick was a lieutenant and supervisor in those units.

_____

[2] Because the Complaint asserts separate claims against Nodiff and Washlick based on supervisory liability, we read the allegations against these two Defendants in Count I and X, as well as in the due process claim in Count II and the conspiracy claim in Count IV, to be grounded on their involvement in a capacity other than as supervisors.

(Compl. ¶¶ 14, 16-17.)   The Devlin Defendants reported to Nodiff, who in turn reported to Washlick.   (Id. ¶ 53.)

According to the Complaint, in 1992, Nodiff assigned the Devlin Defendants to reinvestigate Barbara Jean's murder and the three together "reviewed the case file . . . , spoke to the original investigators, went and 'knocked on every single door in the neighborhood' to conduct neighborhood surveys, and re-interviewed people who had been interviewed in the initial investigation."   (Id. ¶ 54.)   Rocks was also assigned to assist in the investigation.   (Id. ¶ 62.) Rocks was familiar with Ogrod because he had been the assigned detective in the 1986 murder at the Ogrod residence.   (Id. ¶¶ 56-57.)   The case file for the 1986 murder included a photograph depicting weight equipment and the lateral pull-down bar that was identified in Ogrod's falsified confession as the weapon used to murder Barbara Jean.   (Id. ¶¶ 60-62; see also id. ¶ 62 (alleging that Rocks testified at Ogrod's trial regarding his involvement in the processing of the 1986 murder scene and the lateral pull-down bar).)   That same case file also included Rocks' type-written description of Ogrod's basement, which included the information that the door from the basement to the driveway was nailed shut and that the second basement door was blocked by large transmission equipment, i.e., information that was incompatible with the Ogrod's falsified confession that he entered and exited the basement through that door on the day of the murder. (Id. ¶ 214.)   Those type-written notes were not disclosed prior to either of Ogrod's trials.   (Id.)

The Complaint also alleges that, in the course of the investigation, Barbara Jean's parents had contact with Nodiff.   (Id. ¶ 174.)   The Complaint alleges that Barbara Jean's parents subsequently complained about the treatment that they received from Nodiff and the Devlin Defendants, asserting that they were summoned to the police station, believing that they were going to be updated regarding the status of the case, and that, instead, Barbara Jean's mother was

given a polygraph and accused of withholding information that her husband had killed her daughter.   (Id. ¶ 174.)

Ultimately, the Complaint alleges that all of the individual Defendants, including Nodiff, Rocks, and Washlick, knew that probable cause did not exist to prosecute Ogrod for Barbara Jean's murder and, in spite of that knowledge, they caused Ogrod to be arrested, charged, and prosecuted for the murder.   (Id. ¶ 276.)   It further alleges that all of the individual Defendants, including Nodiff, Rocks, and Washlick, fabricated evidence and intentionally misrepresented exculpatory evidence, which resulted in Ogrod's arrest and prosecution without probable cause.   (Id. ¶ 277.)

We find that the allegations of Rocks' and Nodiff's involvement in the investigation of Barbara Jean's murder and the eventual prosecution of Ogrod with falsified evidence procured in that investigation are sufficient to state a malicious prosecution claim against Rocks and Nodiff. Indeed, we conclude that the allegations as a whole, read in the light most favorable to Ogrod, allow for the reasonable inference that Rocks and Nodiff concealed or misrepresented material facts that were critical to Ogrod's prosecution.

In contrast, we find that the allegations concerning Washlick amount to nothing more than that Washlick was Nodiff's supervisor and, thus, those allegations can only be read as an attempt to impose liability for malicious prosecution based on respondeat superior.   We therefore grant the City Defendants' Motion insofar as it seeks dismissal of the Fourth Amendment and state law malicious prosecution claims against Washlick, but deny the Motion insofar as it seeks dismissal of the same claims against Rocks and Nodiff.

### 2.   Fourteenth Amendment

All Defendants also argue that the individual Defendants are entitled to qualified immunity on Ogrod's malicious prosecution claim grounded on the Fourteenth Amendment, because there

is no clearly established procedural due process right against malicious prosecution in the Fourteenth Amendment.   Specifically, they argue that neither the Supreme Court nor the United States Court of Appeals for the Third Circuit has held that the Fourteenth Amendment confers such a clearly established procedural due process right.

In 2014, the Third Circuit explicitly stated that there was a lack of clarity in its own case law regarding the viability of a Fourteenth Amendment procedural due process claim for malicious prosecution.   Halsey, 750 F.3d at 290 n.14.   In particular, the Third Circuit observed that, in 1998, in Torres v. McLaughlin, 163 F.3d 169 (3d Cir. 1998), it "reaffirm[ed] that section 1983 malicious prosecutions claims may not be based on substantive due process, but declin[ed] to decide whether they could be grounded in procedural due process."   Halsey, 750 F.3d at 290 n.14 (citing Torres, 163 F.3d at 173).   That same year, in Gallo v. City of Philadelphia, 161 F.3d 217 (3d. Cir. 1998), it "suggest[ed] that Supreme Court case law leaves only the Fourth Amendment as [a] potential source of malicious prosecution claims."   Halsey, 750 F.3d at 290 n.14 (citing Gallo, 161 F.3d at 222).

Based on this Third Circuit authority, we can only conclude that, between 1992 and 1996, when Ogrod was both interrogated and convicted, it was not clearly established that the Fourteenth Amendment provided for a procedural due process right against malicious prosecution.   Accord Thorpe v. City of Philadelphia, Civ. A. No. 19-5094, 2020 WL 5217396, at *16 (E.D. Pa. Sept. 1, 2020) (concluding that "a Fourteenth Amendment procedural due process right against malicious prosecution was not clearly established in 2008—and is still not clearly established for that matter"); Gilyard v. Dusak, Civ. A. No. 16-2986, 2018 WL 2144183, at *5 (E.D .Pa. May 8, 2018) (concluding that "in 1998 (and today) our courts had not clearly established [that] a citizen had a Fourteenth Amendment procedural due process right to be free from malicious prosecution").   We

14

therefore conclude that the individual Defendants are entitled to qualified immunity on Ogrod's malicious prosecution claim in Count I insofar as it is grounded on the Fourteenth Amendment, and we dismiss Count I to the extent that it asserts such a claim.

### B.   Deprivation of Liberty Without Due Process of Law - Count II

Count II asserts that the individual Defendants violated Plaintiff's "constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence," "deliberately using coercion and/or suggestion to obtain inculpatory witness statements," "withholding material exculpatory and impeachment evidence," and failing to conduct a constitutionally adequate investigation.   (Compl. ¶¶ 282-84.)   Defendants move to dismiss this Count insofar as it asserts claims based on Brady violations and based on violations of the purported right to a constitutionally adequate investigation.   The City Defendants also move to dismiss the Count insofar as it asserts claims against Rock, Washlick, and Nodiff based on the fabrication of evidence, arguing that the Complaint does not allege their personal involvement in such conduct.

### 1.   Brady Violations

Defendants argue that the individual Defendants are entitled to qualified immunity on Count II insofar as it rests on their alleged failure to disclose exculpatory evidence in violation of Brady, because there was no clearly established law at the time of Ogrod's conviction in 1996 that required police officers to make Brady disclosures.[3]

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that a prosecutor's failure to disclose exculpatory evidence to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

---

[3] The Devlin Defendants also argue that we should dismiss the Brady claim against them because the Complaint fails to allege any specific exculpatory facts that they withheld.   However, we need not address this argument because we dismiss the Brady claim on other grounds.

prosecution." Id. at 87.   In 2005, the Third Circuit considered the question of when, if ever, this constitutional duty to disclose exculpatory evidence had been extended to investigating police officers.   Gibson v. Superintendent of N.J. Dep't of Lab. & Pub. Safety, 411 F.3d 427, 442-44 (3d Cir. 2005).   It noted that, in 2000, it "was only able to *assume* that police officers 'have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists.'"   Id. at 444 (quoting Smith v. Holtz, 210 F.3d 186, 197 n.14 (3d Cir. 2000)).   It therefore concluded that a police officer's duty to make such disclosures was not clearly established before that time.   Id. at 443-44 (concluding that the duty was not clearly established at the time of the plaintiff's conviction in 1994); accord Outlaw v. City of Phila., Civ. A. No. 21-1290, 2021 WL 3471168, *6 (E.D. Pa. Aug. 6, 2021) (finding that the constitutionality of detectives' conduct in withholding exculpatory evidence was not "beyond debate" between 2000 and 2004); Gilyard, 2018 WL 2144183, at *4-5 (finding detectives' obligations to turn over exculpatory evidence to prosecutors were not clearly established in 1997 and 1998).   We therefore similarly conclude that the individual Defendants' duty under the due process clause and Brady to disclose exculpatory evidence was not clearly established in 1996, when Ogrod was convicted of Barbara Jean's murder.

Accordingly, we hold that the individual Defendants are entitled to qualified immunity on Count II of the Complaint insofar as it rests on the withholding of material exculpatory evidence, and we grant Defendants' Motions insofar as they seeks dismissal of that aspect of Count II.

2.   <u>Constitutionally Inadequate Investigation</u>

Defendants argue that the Complaint fails to plead a cognizable due process claim for failing to conduct a constitutionally adequate investigations because there is no constitutional right to a police investigation and the Third Circuit has not recognized a cause of action arising out of

an allegedly deficient investigation.   Ogrod has identified no case in which such a right has been recognized, and courts in this Circuit have stated without qualification that "[t]here is 'no constitutional right to a police investigation.'"   Thomas, 290 F. Supp. 3d at 386 (quoting Whitehead v. City of Philadelphia, Civ. A. No. 13-2167, 2014 WL 657486, at *2 (E.D. Pa. Feb. 19, 2014)); see also Lewis v. City of Philadelphia, Civ. A. No. 19-2847, 2020 WL 1683451, at *11 (E.D. Pa. Apr. 6, 2020); Outlaw, 2021 WL 3471168, at *6-7 (quoting Thomas, 290 F. Supp. 3d at 386).   Moreover, even if such a right could be found to exist, "it is not—and certainly was not in the mid-1990s—clearly established, meaning that the defendants are (or would be) shielded by qualified immunity." Thomas, 290 F. Supp. 3d at 386 (citing Al–Kidd, 563 U.S. at 741, and Mammaro v. N.J. Div. of Child Protection, 814 F.3d 164, 169 (3d Cir. 2016)).

On the basis of this caselaw, which we find to be correctly reasoned, we dismiss Count II to the extent that it asserts that the individual Defendants violated Ogrod's constitutional rights by failing to conduct an adequate investigation.

### 3.   Personal Involvement

The City Defendants argue that we should dismiss the remainder of the claims in Count II to the extent that they are asserted against Rocks, Nodiff, and Washlick because the Complaint does not allege these Defendants' personal involvement in the fabrication of evidence.   As we noted earlier, the Complaint's only factual allegation concerning Washlick is that he was Nodiff's supervisor.   The Complaint therefore contains no factual allegations that give rise to a reasonable inference that Washlick was personally involved in the fabrication of evidence.   In contrast, the Complaint alleges or gives rise to a reasonable inference that Rocks was involved in the investigation of Barbara Jean's murder, brought to that investigation the information about the weight equipment in Ogrod's basement, and was thereby involved in the fabrication of Ogrod's

confession that identified the lateral pull-down bar as the murder weapon.   (See Compl. ¶ 56-57, 60-62.)   Similarly, the Complaint alleges or gives rise to a reasonable inference that Nodiff was working hand-in-hand with the Devlin Defendants in the Barbara Jean murder investigation, not only supervising their work, but also knocking on doors, and interviewing, mistreating, and pressuring witnesses.   (Id. ¶¶ 54, 174.)   At this stage of the proceedings, prior to the completion of discovery, we conclude that these allegations are sufficient to give rise to a reasonable inference that Nodiff and Rocks were involved in the fabrication of evidence allegedly used to wrongfully convict Ogrod.   We therefore grant the City Defendants' Motion to the extent that it seeks to dismiss the remainder of Count II as it pertains to Washlick, but deny its request that we dismiss the remainder of the Count as it pertains to Nodiff and Rocks.

## C.   Right Against Self-Incrimination - Count III

Count III of the Complaint asserts that the Devlin Defendants violated Ogrod's right against self-incrimination in violation of the Fifth and Fourteenth Amendments by coercing him into signing a fabricated statement and then using his coerced statement against him.[4]   (Compl. ¶¶ 288-90.)   The Devlin Defendants move to dismiss this claim, arguing that only a prosecutor can be held liable under § 1983 and the Fifth Amendment for introducing a coerced statement at trial.[5]

---

[4] The Devlin Defendants state that they do not object to the reference to the Fourteenth Amendment in this claim to the extent that the reference merely acknowledges that the Fifth Amendment has been made applicable to the states.   See Griffin v. California, 380 U.S. 609, 611 (1965) (stating that "the Self-Incrimination Clause of the Fifth Amendment [has been] made applicable to the States by the Fourteenth" (citing Malloy v. Hogan, 378 U.S. 1 (1964)).   Ogrod does not indicate in his response to the Devlin Defendants' Motion that he instead intended to assert an independent claim pursuant to the Fourteenth Amendment.   We therefore do not read the reference to the Fourteenth Amendment in Count III to assert a separate Fourteenth Amendment claim.

[5] The Devlin Defendants observe that Count III of the Complaint asserts "in passing" that

The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has held that the Fifth Amendment "is violated whenever a truly coerced confession is introduced at trial, whether by way of impeachment or otherwise." Kansas v. Ventris, 556 U.S. 586, 590 (2009) (citation omitted); see also Chavez v. Martinez, 538 U.S. 760, 770 (2003) ("[A] violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case.")

In arguing that Ogrod could only bring a Fifth Amendment self-incrimination claim against the prosecutor, the Devlin Defendants primarily rely on the district court case of Bodle v. Linhardt, Civ. A. No. 12-2425, 2013 WL 2481250 (M.D. Pa. June 10, 2013). In Bodle, the court considered a plaintiff's Fifth Amendment claim that was based on allegations that two defendant police officers had obtained a false confession from him using coercion and threats. Id. at *7. Quoting Chavez v. Martinez, 538 U.S. 760 (2003), the Bodle court observed that "a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." 2013 WL 2481250, at *7 (quoting Chavez, 538 U.S.

_____

they failed to inform Ogrod of his Miranda rights. (Devlin Defs.' Mem. at 31; see also Compl. ¶ 289 (alleging that the circumstances of Ogrod's interrogation were coercive, in part, because the Devlin Defendants "failed to inform him of his Miranda rights.") They argue that, to the extent that Ogrod intended to assert a Fifth Amendment claim against them based on a Miranda violation, we should dismiss the claim because the state court found at Ogrod's suppression hearing that Ogrod had been informed of his Miranda rights and that, in any event, the failure to provide Miranda warnings does not constitute a constitutional violation that can be the subject of a § 1983 action. See, e.g., Renda v. King, 347 F.3d 550, 558 (3d Cir. 2003) (noting that, in a split decision in Chavez v. Martinez, 538 U.S. 760 (2003), six Justices of the Supreme Court have "agreed that mere custodial interrogation absent Miranda warnings is not a basis for a § 1983 claim"). Ogrod does not clarify in his response to the Devlin Defendants' Motion with regard to Count III whether he intended to assert a Fifth Amendment claim based specifically on the lack of Miranda warnings. We thus conclude that no such claim has been asserted and we do not address it further.

at 770).   The plaintiff in <u>Bodle</u> had not alleged that his confession had been used against him at trial and, thus, the <u>Bodle</u> court dismissed the plaintiff's Fifth Amendment claim, explaining that it could not reasonably infer that the plaintiff had been compelled to be a witness against himself. <u>Id.</u>   The court then added that "even if [the plaintiff] had alleged that [his coerced] confession was used against him at trial, the use of the confession would have been the work of the prosecutor, not [the] defendants."   <u>Id.</u> (citing <u>Yarris v Cnty. of Delaware</u>, 465 F.3d 129, 143 (3d Cir. 2006) (observing that "the introduction in evidence of . . . false testimony [is] the work of prosecutors— not the . . . Detectives [who allegedly obtained the false testimony by trickery or deceit]—and is covered by absolute prosecutorial immunity")).

The Devlin Defendants focus on the <u>Bodle</u> court's added comment, maintaining that it makes clear that a Fifth Amendment claim cannot be asserted against a police officer who coerced a statement, but can only be brought against the prosecutor who subsequently uses the coerced statement in court.   However, we consider this comment in <u>Bodle</u> to be dictum, as it was not essential to the court's holding.   See <u>In re McDonald</u>, 205 F.3d 606, 612 (3d Cir. 2000) (defining dictum as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." (quoting <u>Sarnoff v. American Home Prods. Corp.</u>, 798 F.2d 1075, 1084 (7th Cir. 1986))).   Moreover, the only legal authority that <u>Bodle</u> cites for its comment is the Third Circuit's decision in <u>Yarris</u>, which was addressing claims under the Fourth, Sixth, and Eighth Amendments, not the Fifth Amendment.   See <u>Yarris</u>, 465 F.3d at 140 & n.7.   Accordingly, we conclude that the Devlin Defendants have cited no authority that persuasively supports their argument that they cannot be held liable under § 1983 and the Fifth Amendment for coercing Ogrod's confession that was later used against him at trial.

The Devlin Defendants alternatively argue in a single sentence that they are entitled to qualified immunity because "it has not been clearly established – and certainly was not clearly established in 1992 – that the Fifth Amendment right against self-incrimination is violated by police officers in obtaining evidence which prosecutors chose to use at trial."   (Devin Defs.' Mm. at 31.)   However, aside from <u>Bodle</u> and <u>Yarris</u>, the Devlin Defendants cite no legal authority for the proposition that a reasonable police officer in 1992 would not have understood that he was violating the Fifth Amendment by coercing a statement from a suspect that a prosecutor might later use at trial.[6]   Under these circumstances, we conclude that, at this stage of the proceedings, the Devlin Defendants have failed to meet their burden of establishing that they are entitled to qualified immunity on Ogrod's Fifth Amendment claim.   See <u>Kopec v. Tate</u>, 361 F.3d 772, 776 (3d Cir. 2004) ("A defendant has the burden to establish that he is entitled to qualified immunity." (citation omitted)).   We therefore deny the Devlin Defendants' Motion insofar as it seeks dismissal of Count III of the Complaint.

### D.   Civil Rights Conspiracy – Count IV

Count IV of the Complaint asserts that the individual Defendants conspired to deprive Ogrod of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable search and seizure, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial.

---

[6] Without doing a complete historical analysis of Fifth Amendment law, we do note that at least two Courts of Appeals have previously refused to afford police officers qualified immunity on similar claims.   See, e.g., <u>Stoot v. City of Everett</u>, 582 F.3d 910, 927-28 (9th Cir. 2009); <u>Higazy v. Templeton</u>, 505 F.3d 161, 174-75 (2d Cir. 2007).   Indeed, both of these cases specifically held that "an officer is not entitled to qualified immunity [on a Fifth Amendment claim] where '[a] reasonable fact finder could conclude that it was not reasonable for an officer to believe that it was constitutional to coerce a confession and then to hand that information to a prosecutor—without divulging the means by which the confession was acquired—for use in a criminal case.'"   <u>Stoot</u>, 582 F.3d at 927-28 (alteration in original) (quoting <u>Higazy</u>, 505 F.3d at 174-75).

It alleges a series of overt acts in furtherance of the conspiracy, including coercing and fabricating witness statements and Ogrod's confession, failing to comply with their disclosure obligations under Brady, prosecuting Ogrod without probable cause, and committing perjury during Ogrod's hearings and trial.  (Compl. ¶ 294.)  Defendants move to dismiss this claim, arguing that the Complaint lacks sufficient factual specificity to state such a claim upon which relief can be granted.

To assert a conspiracy claim under § 1983, a plaintiff must allege "that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150-52(1970)).  "To constitute a conspiracy, there must be a 'meeting of the minds.'"  Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008) (quoting Adickes, 398 U.S. at 158).  Ultimately, "that 'meeting of the minds' or 'understanding or agreement to conspire' can be 'infer[red]' from circumstantial evidence."  Jutrowski, 904 F.3d at 295 (alteration in original) (quoting Startzell, 533 F.3d at 205).

The Devlin Defendants argue that the Complaint fails to allege a plausible conspiracy claim against them because it includes only a boilerplate allegation that "the individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Ogrod of his clearly established Fourth, Fifth, and Fourteenth Amendment rights."  (Compl. ¶ 293.)  Similarly, the City Defendants argue that the conspiracy allegations are insufficient with respect to Rocks, Nodiff, and Washlick because the allegations fail to articulate how these three Defendants acquiesced or were involved in Ogrod's allegedly coerced confession or the initiation of prosecution on the basis of known false evidence, and that it is not sufficient to merely allege that they were in the same unit as the Devlin Defendants.

We find, however, that the allegations in the Complaint regarding the involvement of the Devlin Defendants, Rocks, and Nodiff in the investigation and prosecution of Ogrod, which we have detailed earlier, are sufficiently specific to raise an inference of concerted action that could circumstantially support a reasonable conclusion that those four Defendants had a meeting of the minds to arrest and assist in the prosecution of Ogrod in the absence of probable cause and based on falsified evidence.   In contrast, in the absence of any specific allegations concerning Defendant Washlick, aside from the allegation that he was Nodiff's supervisor in the Special Investigations Unit (id. ¶ 53), we conclude that there are insufficient allegations to support a claim against him for a civil rights conspiracy.   We therefore grant the City Defendants' Motion to Dismiss insofar as it seeks dismissal of Count IV's conspiracy claim against Washlick but otherwise deny Defendants' Motions insofar as they seek dismissal of Count IV.

### E.    Failure to Intervene – Count V

Count V of the Complaint alleges that the individuals Defendants are constitutionally liable for failing to intervene on Ogrod's behalf to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law.   The individual Defendants move to dismiss the failure to intervene claim in Count V, arguing that they are entitled to qualified immunity because there is no clearly established constitutional obligation to intervene in an unconstitutional interrogation or investigation.   Defendants acknowledge that a constitutional claim for failure to intervene has been recognized in connection with excessive force claims, but they maintain that the same principle has not clearly been extended beyond that Eighth Amendment context.

In Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002), the Third Circuit held that a police officer could be held liable pursuant to § 1983 and the Eighth Amendment for failure to intervene

in a beating, explaining that "[c]ourts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior." Id. at 650; see also id. at 651 (stating that "[t]he restriction on cruel and unusual punishment contained in the Eight Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who unjustifiably and excessively employ fists, boots or clubs"). The court reasoned that "the approving silence emanating from [an] officer who stands by and watches as others unleash an unjustified assault contributes to the actual use of excessive force," because the silence offers "tacit support . . . to those who are actually striking the blows." Id. at 651. More recently, the Third Circuit observed that it has not extended failure-to-intervene liability to the false arrest context, i.e., to hold an officer liable under § 1983 for failing to intervene when another officer arrested the plaintiff without probable cause. Lozano v. New Jersey, 9 F.4th 239, 246 n.4 (3d Cir. 2021); see also Ekwunife v. City of Philadelphia, 245 F. Supp. 3d 660, 673 (E.D. Pa. 2017) (finding no legal basis for a conclusion that "a failure-to-intervene claim exists under federal . . . law. . . where a prosecutor allegedly failed to intervene to correct false information in an affidavit of probable cause submitted by a police officer"); cf. Ekwunife v. City of Philadelphia, 756 F. App'x 165, 170 (3d Cir. 2018) (assuming without deciding that a failure to intervene claim could be asserted against an officer who served a deficient arrest warrant).

At least two district courts in this District have also considered whether police officers had a clearly defined duty to intervene outside of the Eighth Amendment excessive force context. In Thorpe v. City of Philadelphia, Civ. A. No. 19-5094, 2020 WL 5217396 (E.D. Pa. Sept. 1, 2020), the court considered whether police officers were entitled to qualified immunity on § 1983 claims asserting that they had failed to intervene in another officer's fabrication of evidence and

withholding of evidence. Id. at *10-11. In addressing that question, the court rejected the plaintiff's argument that Smith had put the defendants on notice that they were obligated to intervene in the face of such constitutional violations, observing that "this line of reasoning runs the risk of defining the clearly established law 'at a high degree of generality,' which the Supreme Court has long instructed courts not to do." Id. at *10 (quoting Bland v. City of Newark, 900 F.3d 77, 83 (3d Cir. 2018)). The court also observed that the plaintiff's position was that the defendants' duty to intervene "exist[ed] for the entire duration of the investigation and prosecution—rather than the fleeting moment in time afforded an officer in the presence of unconstitutional physical action," and it noted that this attempt to impose a duty over such a long time period "exemplifie[d] the heightened generality of the proposition." Id. at *10. In the end, the court concluded that "it was not sufficiently clear that reasonable officers would have understood that failing to intervene when confronted with another's fabrication and withholding of evidence violated [the plaintiff's] constitutional rights," and it thus found that the defendant officers were entitled to qualified immunity with respect to the plaintiff's failure to intervene claims. Id. at *11.

Later, in Outlaw v. City of Philadelphia, Civ. A. No. 21-1290, 2021 WL 3471168 (E.D. Pa. Aug. 6, 2021), the court relied in part on Thorpe to find that police detectives were entitled to qualified immunity on a claim that they had failed to intervene to prevent a plaintiff's false arrest, malicious prosecution, false imprisonment, and deprivation of liberty. Id. at *7. The court explained that neither its independent research nor the plaintiff's briefing had identified any cases from the Third Circuit that had recognized a constitutional duty to intervene under such circumstances, and it therefore refused to take "impermissible liberties in defining the asserted rights." Id.

We are aware of no legal authority on which we could base a conclusion that the individual Defendants had a clearly established duty to intervene to prevent his false arrest, malicious prosecution, false imprisonment and deprivation of liberty.   While <u>Smith</u> is clear that there is such a duty in connection with an excessive force violation, there is simply no clear authority that such a duty exists in other contexts.   We therefore conclude that the individual Defendants did not violate a clearly established right by allegedly failing to intervene in their fellow officers' actions in fabricating evidence and engaging in malicious prosecution.   Consequently, we conclude that the individual Defendants are entitled to qualified immunity on Ogrod's failure to intervene claims and we dismiss Count V on that basis.

**F.   Supervisory Liability - Counts VI and VIII**

Count VI and VIII of the Complaint assert supervisory liability claims against Defendants Nodiff and Washlick.    The City Defendants move to dismiss these two Counts, arguing that the Complaint includes only conclusory allegations that are inadequate to state supervisory liability claims upon which relief can be granted.

Although § 1983 liability cannot be predicated on principles of *respondeat superior*, <u>Rode</u>, 845 F.2d at 1207, there are two theories under which supervisors may be held liable based on principles of supervisory liability, <u>Parkell v. Danberg</u>, 833 F.3d 313, 330 (3d Cir. 2016) (quotation omitted).   Under the first theory, "supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm" and acted "with deliberate indifference to the consequences."   <u>Id.</u> (quoting <u>Santiago v. Warminster Twp.,</u> 629 F.3d 121, 129 n.5 (3d Cir. 2010)); <u>A.M. v. Luzerne Cnty Juv. Det. Ctr.,</u> 273 F.3d 572, 586 (3d Cir. 2004) (quoting <u>Stoneking v. Bradford Area Sch. Dist.,</u> 882 F.2d 7720,725 (3d Cir. 1989)).    Under the second theory, supervisors "can be liable if they participated in violating plaintiff's rights,

directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations."   Parkell, 833 F.3d at 330 (quoting Santiago, 629 F.3d at 129 n.5). "[A] plaintiff asserting a failure to supervise claim must not only identify a specific supervisory practice that the defendant failed to employ, he or she must also allege 'both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval.'"   C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 202 (3d Cir. 2000) (quoting Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997)); see also id. (stating that "[a] state official may be held responsible under § 1983 for exercising or failing to exercise supervisory authority . . . only if that official 'has exhibited deliberate indifference to the plight of the person deprived.'" (quoting Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989))

Here, Counts VI and VII of the Complaint assert that Nodiff failed to adequately train, supervise, and discipline Devlin and Worrell, and that Washlick failed to adequately train, supervise, and discipline Devlin, Worrell, Rocks, Snyder, and Nodiff, both in connection with Ogrod's case and as a matter of practice and custom.   (Compl. ¶¶ 301, 313.)   The Counts further aver that Nodiff and Washlick acted with deliberate indifference and thereby allowed and caused their supervisees to deprive Ogrod of "his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial."   (Id. ¶¶ 302, 314.)   In addition, the Complaint asserts that both Nodiff and Washlick were personally involved in the investigation of Ogrod and directly supervised the investigative acts taken by Devlin and Worrell (and in Washlick's case, Rocks and Nodiff as well).   (Compl. ¶¶ 303, 315.)

The City Defendants argue that these allegations are insufficient because they are

conclusory and there "is no articulation of awareness of an unreasonable risk and deliberate indifference." (City Defs.' Mem. at 13.)   In their view, Ogrod improperly "relies on association rather than conduct to impute liability." (Id.)

As observed above, the Complaint's only factual allegations concerning Washlick are that he was a Lieutenant in the Special Investigations Unit within the Homicide Unit of the Philadelphia Police Department in 1991 and 1992, and that Sergeants Nodiff, Snyder, and Sergeant Ray Barlow reported to him. (Compl. ¶¶ 17, 53.)   Such unadorned allegations are plainly insufficient to support a plausible claim for supervisory liability.   Accordingly, we grant the City Defendants' Motion to Dismiss insofar as seeks dismissal of Count VII of the Complaint, which asserts a supervisory liability claim against Washlick.

On the other hand, as described in greater detail above, the Complaint alleges that Nodiff was the Devlin Defendants' supervisor, assigned both Devlin and Worrell to reinvestigate the unsolved murder of Barbara Jean, and worked with them in connection with that investigation. (Compl. ¶¶ 54, 174.)   We find that these allegations, read in conjunction with the allegations regarding the Devlin Defendants' conduct in the Ogrod investigation, are sufficient to raise a reasonable inference that Nodiff had knowledge of and acquiesced in the Devlin Defendants' alleged violations of Ogrod's constitutional rights.   They also raise an inference that Nodiff's knowledge of their alleged misconduct was contemporaneous with that conduct and that he "communicated a message of approval" by failing to either discipline them for the misconduct or adequately train them as to their constitutional obligations   C.H. ex rel. Z.H., 226 F.3d at 202 (3d Cir. 2000) (quoting Bonenberger, 132 F.3d at 25).   We therefore deny the City Defendants' Motion to Dismiss insofar as the City Defendants seek dismissal of Count VI of the Complaint, which asserts a supervisory liability claim against Nodiff.

### G.   Municipal Liability – Count IX

Count IX of the Complaint asserts a Monell claim against the City for violating Ogrod's constitutional rights by maintaining "a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations."   (Compl. ¶ 319.)   The City Defendants move to dismiss this claim, but only to the extent that it asserts municipal liability grounded on conduct that is not constitutionally prohibited or for which the individual Defendants are entitled to qualified immunity.   Thus, the City Defendants ask that we dismiss the Monell claim only to the extent that it is grounded on Ogrod's underlying claims of malicious prosecution pursuant to the Fourteenth Amendment, Brady claims, and/or claims asserting a failure to intervene or inadequate investigation.   They do not move to dismiss the Monell claims insofar as it is grounded on malicious prosecution under the Fourth Amendment or on a Fourteenth Amendment claim for fabrication of evidence.

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."   Monell, 436 U.S. at 694.   Instead, to assert a § 1983 claim against a municipality, i.e., a Monell claim, a plaintiff must allege that his constitutional deprivations were caused by an official policy or custom of the municipality or the municipality's failure to train its employees.   Id.; Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997); City of Canton v. Harris, 489 U.S. 378, 388-89 (1989).   A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." Simmons v. City of Philadelphia, 947 F.2d 1042, 1059 (3d Cir. 1991) (alteration in original) (quoting Monell, 436 U.S. at 690).   A custom, on the other hand, "is an act 'that has not been formally approved by an appropriate decision-maker,' but that is 'so widespread as to have the force of law.'"   Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting

Bryan Cnty., 520 U.S. at 404).   The plaintiff must also allege that the municipal body employed the deficient policy or custom with "deliberate indifference" to the constitutional deprivations the policy or custom caused.   City of Canton, 489 U.S. at 388-89; Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996) (stating that, while the deliberate indifference standard originally applied to failure to train cases, it has been adopted "in other policy and custom contexts" (citations omitted)).   Plaintiffs can plead such deliberate indifference by alleging that decision-makers knew that similar constitutional deprivations had previously occurred and were aware of ways to prevent them, "but either deliberately chose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction in this regard."   Beck, 89 F.3d at 972 (quoting Simmons, 947 F.2d at 1064).

Courts of Appeals in other Circuits have held that a municipality cannot be deliberately indifferent to a right that is not clearly established.   Szabla v. City of Brooklyn Park, 486 F.3d 385, 393 (8th Cir. 2007) (en banc) ("[A] municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established."); see also Bustillos v. El Paso Cnty. Hosp. Dist., 891 F.3d 214, 222 (5th Cir. 2018) (quoting Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 511 (6th Cir. 2012)); Arrington-Bey v. City of Bedford Heights, Ohio, 858 F.3d 988, 995 (6th Cir. 2017) (explaining that there can be no deliberate indifference under Monell when the constitutional right allegedly violated was not clearly established); Young v. Cnty. of Fulton, 160 F.3d 899, 904 (2d Cir. 1998) (stating that a Monell claim based on "failure to train cannot be sustained unless the employees violated a clearly established federal constitutional right").

While the Third Circuit has not yet addressed this same issue, district courts in this District have similarly concluded that where rights are not clearly established, there can be no municipal

liability under <u>Monell</u> for violations of those rights because there can be no deliberate indifference. <u>Thomas</u>, 290 F. Supp. 3d at 387; <u>see also</u> <u>Outlaw</u>, 2021 WL 3471168, at *8 (citations omitted); <u>Lewis</u>, 2020 WL 1683451, at *12 (explaining that "[i]f the right at issue is not clearly established, then any assertion of deliberate indifference is substantially undercut because, by definition, there are no clear constitutional guideposts for the municipality to follow in developing policy" (quotation and internal quotation marks omitted)); <u>Dennis v. City of Philadelphia</u>, 379 F. Supp. 3d 420, 435 (E.D. Pa. 2019) (citations omitted).

Here, the <u>Monell</u> claim against the City for municipal liability is grounded in part on the City's alleged failure to exercise sufficient oversight over, or to investigate and/or discipline, officers who used unconstitutional coercive techniques in interrogations, withheld exculpatory evidence, and "pursue[d] profoundly flawed investigations and prosecutions," as well as the City's alleged failure to train officers regarding their duties under <u>Brady</u> and other constitutional obligations.   (Compl. ¶ 321.)   The precise contours of this claim are not clear, but, based on the caselaw above, we conclude that the claim fails to state a claim upon which relief can be granted to the extent that it seeks to impose municipal liability for violations of rights that we have already found were not clearly established in 1996, because the City cannot be deliberately indifferent to such unestablished rights.   Thus, we grant the City's Motion to Dismiss the <u>Monell</u> claim in Count IX insofar as it asserts that the City is liable for failure to train, oversee, or punish officers concerning <u>Brady</u> violations, the failure to intervene, the failure to conduct "constitutionally adequate" investigations, and malicious prosecution in violation of the Fourteenth Amendment. In other respects, however, the <u>Monell</u> claim will proceed.

### H.  Issue Preclusion

The Devlin Defendants have also argued that all of the claims against them are barred by

the doctrine of issue preclusion.   Issue preclusion, also known as collateral estoppel, is based upon the principle that "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise."   Dici v. Pennsylvania, 91 F.3d 542, 547 (3d Cir. 1996) (quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991)).   Its application by federal courts is grounded in the federal full faith and credit statute, 28 U.S.C. § 1738, which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."   Id. (alteration in original); accord Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985).   Thus, federal courts "look to state law to determine the preclusive effect of a prior state judgment." Metro. Edison Co. v. Pa. Pub. Util. Comm'n, 767 F.3d 335, 350-51 (3d Cir. 2014) (citing Marrese, 470 U.S. at 380).

Under Pennsylvania law, in order for issue preclusion to apply, five elements must be satisfied: (1) the issue is identical to one that was presented in a prior case; (2) there has been a final judgment on the merits of the issue in the prior case; (3) the party against whom the doctrine is asserted was a party in, or in privity with a party in, the prior action; (4) the party against whom the doctrine is asserted, or one in privity with the party, had "a full and fair opportunity to litigate the issue in the prior proceeding"; and (5) the determination reached in the prior proceeding was "essential to the judgment."   Id. at 351 (quoting Office of Disciplinary Couns. v. Kiesewetter, 889 A.2d 47, 50–51 (Pa. 2005)); Cohen v. Workers' Comp. Appeal Bd., 909 A.2d 1261, 1264 (Pa. 2006) (citation omitted).   "The party asserting issue preclusion . . . bears the burden of proving its applicability to the case at hand."   Dici, 91 F.3d at 548-49 (citation omitted).

Here, the Devlin Defendants assert that all of Ogrod's claim are based in whole or in part

on the allegation that his April 1992 confession to them was unconstitutionally coerced; that the state court already determined following a four-day suppression hearing that his confession had been voluntarily made; and that principles of issue preclusion dictate that Ogrod is now precluded from arguing otherwise.[7]   The Devlin Defendants therefore maintain that Ogrod is precluded from relitigating the issue of whether his confession was unconstitutionally coerced and that all of his claims against them, which rest on this factual premise, fail to state a claim upon which relief can be granted.

Ogrod does not appear to dispute that the issue that the state court determined at the suppression hearing is identical to an issue before this Court.   He also does not dispute that he was a party to the criminal action, or that the suppression ruling was essential to the judgment in that case.   He also does not ask us to conclude that the voluntariness ruling was not a final judgment on the merits.   Ogrod argues only that issue preclusion principles do not apply because he did not have a full and fair opportunity to litigate the validity of his confession at the suppression hearing, asserting that "this is the most important question for this Court."   (Ogrod Mem. at 12-23 (stating that he did not have the benefit of knowing that the Devlin Defendants had fabricated evidence and coerced confessions several times before, or about the circumstances of jailhouse informant Wolchansky, who helped secure his conviction).)

The Pennsylvania Supreme Court has stated that "[w]hat constitutes a full and fair

---

[7] The Devlin Defendant have attached the transcript of the four-day suppression hearing to their Motion.   (Devlin Defs.' Mem., Exs. A-D.)   When deciding a Rule 12(b)(6) motion that raises issue preclusion, we may "consider the prior adjudication in order to determine whether issue preclusion bars that plaintiff's claims."   M & M Stone Co. v. Pennsylvania, 388 F. App'x 156, 162 (3d Cir. 2010).   "[A] prior judicial opinion constitutes a public record of which a court may take judicial notice." Id. (citing Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004)). We may, however, only consider the pertinent judicial document to establish its existence, not for the truth of the facts determined in it.   Id. (citing Lum, 361 F.3d at 221 n.3).

opportunity to litigate an issue can itself be a very complicated determination."  In re Ellis' Est., 333 A.2d 728, 731 n.8 (1975) (citation omitted).   At a minimum, "[a] party does not have an opportunity for a full and fair hearing when 'procedures fall below the minimum requirements of due process as defined by federal law.'"  Witkowski v. Welch, 173 F.3d 192, 205 (3d Cir. 1999) (quoting Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1074 (3d Cir. 1990)); see also Kremer v. Chem. Constr. Corp., 456 U.S. 461, 482 (1982) (stating that, although we must "'give preclusive effect to state-court judgments whenever the courts of the State . . . would do so[,]' . . . [t]he State must . . . satisfy the applicable requirements of the Due Process Clause" (quoting Allen v. McCurry, 449 U.S. 90, 96 (1980))).   Indeed, "[a] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment."  Kremer, 456 U.S. at 482.   Moreover, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."  Id. at 481 (quoting Montana v. United States, 440 U.S. 147, 164 n.11 (1979)) (additional citation omitted).

In making their preclusion argument, the Devlin Defendants argue that Ogrod had a full and fair opportunity to litigate the validity of his confession at the suppression hearing because he was represented by counsel, had the opportunity to present testimony and evidence, and was able to subpoena and cross-examine witnesses.  Metro. Edison, 767 F.3d at 351 n.22 (stating that the "minimum [due process] requirements may . . . include 'the right to be represented by counsel, . . . present testimony and documentary evidence, and . . . subpoena and cross-examine witnesses." (third and fourth alterations in original) (quoting Rue v. K–Mart Corp., 713 A.2d 82, 85 (1998)) (additional citation omitted)).

However, they ignore the Complaint's allegations that the CIU has since advised the state court that Ogrod was "likely innocent," that his trial was fundamentally unfair, and that he was

entitled to relief from his conviction due to due process violations, <u>Brady</u> violations, and additional errors, which resulted in his wrongful conviction.  (Compl. ¶ 248.)  They likewise do not acknowledge the allegation that the CIU specifically concluded and represented to the state court that Ogrod's conviction involved a "false confession[] obtained by Defendants Devlin and Worrell."  (<u>Id.</u> ¶ 249; <u>see also</u> <u>id.</u> ¶ 250 (alleging that CIU concluded that Ogrod's purported confession to Devlin and Worrell was a "sheer falsity").)  Moreover, they do not address the fact that the Complaint alleges that the CIU "urge[d] the Court to . . . vacate [Ogrod's] conviction and sentence" on account of his wrongful imprisonment, and the Commonwealth nolle prossed the case.  (<u>Id.</u> ¶¶ 251, 253.)

       In light of these additional allegations, which we accept as true at this stage of the proceedings, <u>see</u> <u>DelRio-Mocci</u>, 672 F.3d at 245, we cannot now hold that Ogrod had a "full and fair opportunity" to litigate the voluntariness of his confession and that he should therefore be precluded from proceeding with a claim that his confession was wholly fabricated.    In <u>Montgomery v. DeSimone, PTL</u>, 159 F.3d 120 (3d Cir. 1990), the Third Circuit considered whether state court municipal convictions that were overturned on de novo review "conclusively establish[ed] probable cause and necessarily negate[d] any possibility that [the defendant] could establish [a] section 1983 malicious prosecution claim."  <u>Id.</u> at 122.  In that case, a municipal court judge had found that there was probable cause to stop and arrest the defendant for drunk driving and then found the defendant guilty of drunk driving.  <u>Id.</u> at 123.  However, in a trial de novo, the Superior Court of New Jersey reversed the defendant's conviction, and expressed doubt that there had been probable cause for her arrest.  <u>Id.</u>  In holding that the defendant's overturned convictions did not presumptively establish probable cause for purposes of the defendant's § 1983 malicious prosecution action against the township and police department, the Third Circuit

explained that such a presumption would "contravene[] the policies underlying the Civil Rights Act," which was designed "to protect citizens from the misuse of power by individuals cloaked with the authority of state law."   Id. at 125.

The same essential principles apply here and prevent us from applying issue preclusion at this early stage of these § 1983 proceedings to preclude Ogrod from seeking to establish that the Devlin Defendants falsified his confession.   As noted above, the Complaint alleges that the nolle prosse order in this case was based on the CIU's representation that, inter alia, Ogrod's confession to the Devlin Defendants was falsified, that his trial was fundamentally unfair, and that his conviction was the result of due process violations.   (Compl. ¶¶ 248-53.)   Such allegations, along with others in the Complaint, are sufficient to support Ogrod's claim that he was denied a full and full and fair opportunity to litigate the voluntariness of his confession and are therefore sufficient to reject the early application of issue preclusion principles.   C.f. Clark v. Troutman, 502 A.2d 137, 139-141 (Pa. 1985) (declining to apply issue preclusion when, inter alia, its application "would . . . perpetuate an error of constitutional dimension").   We therefore deny the Devlin Defendants' Motion insofar as it seek dismissal of all of the claims against them on the basis of issue preclusion.

## IV.   CONCLUSION

For the foregoing reasons, we grant both Motions to Dismiss in part and deny both in part. Specifically, we grant the Motions to the extent that they seek dismissal of (1) the portion of Count I that asserts a Fourteenth Amendment malicious prosecution claim;   (2) the portion of the Due Process claims in Count II that rest on the withholding of material exculpatory evidence in violation of Brady and/or the violation of Ogrod's right to a constitutionally adequate investigation; (3) Count V's failure to intervene claim; (4) Count VIII's supervisory liability claim

against Defendant Washlick; and (5) that portion of Count IX's <u>Monell</u> claim that rests on underlying constitutional claims that are dismissed with respect to the individual Defendants based on qualified immunity.   We also grant the City Defendants' Motion insofar as it seeks dismissal of the malicious prosecution, conspiracy, and due process claims against Defendant Washlick in Count I, II, IV, and X, and we dismiss Defendant Washlick as a Defendant to this action.

We deny the Motions to the extent that they seek dismissal of the Fourth Amendment and state law malicious prosecution claims in Counts I and X against the Devlin Defendants, Rocks, and Nodiff; the Due Process claims against the Devlin Defendants, Rocks, and Nodiff in Count II insofar as they rests on the fabrication of evidence and the use of coercion and/or suggestion to obtain inculpatory witness statements; the Fifth Amendment self-incrimination claim in Count III against the Devlin Defendants; the conspiracy claims in Count IV against the Devlin Defendants, Rocks, and Nodiff; and the supervisory liability claim in Count VI against Nodiff.   Accordingly, this case will proceed on these claims as well as on the <u>Monell</u> claim against the City to the extent that it does not rest on underlying constitutional claims that have already been dismissed based on qualified immunity.

An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.