IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WALTER OGROD | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL. | : | NO. 21-2499 |

**MEMORANDUM**

**Padova, J.**                                                                                                              **July 12, 2023**

Plaintiff Walter Ogrod commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant the City of Philadelphia (the "City") and several individual Philadelphia police officers after Plaintiff was sentenced to death and spent twenty-eight years in prison in connection with a murder for which he was subsequently exonerated—the murder of Barbara Jean Horn. Presently before the Court is the City's Motion to Compel Production pursuant to a subpoena of nonparty NBC-Subsidiary WCAU-TV, L.P. ("NBC"), NBCUniversal's Philadelphia television station, which produced a documentary series entitled Who Killed Barbara Jean? NBC opposes the Motion and requests that we quash the subpoena. We heard Oral Argument on the Motion on June 27, 2023. For the reasons that follow, the Motion is withdrawn in part, denied in part without prejudice, and granted in part.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

In September 2021, NBC released a 12-episode documentary about the Barbara Jean Horn murder and Ogrod's trial, conviction, and subsequent exoneration of the crime. The documentary includes interviews with Ogrod, his lawyers and supporters, members of the victim's family, law enforcement personnel, attorneys, and at least one eyewitness. Based on NBC's production of the documentary, on January 26, 2023, the City served NBC with a subpoena for, inter alia, "[a]ll footage, audio, documents, notes, or other recorded information"—aired or unaired—created or

used by NBC at any time that concern Ogrod, Horn, or the relevant criminal investigation, criminal trial, posttrial proceedings, or exoneration. (Mot. Ex. A at 6 of 6.) On March 28, 2023, NBC objected to the subpoena in a letter to the City, in which it agreed to produce any aired reports covered by the subpoena but refused to produce any *unaired* materials based on the qualified reporter's privilege. (Mot. Ex. B; Resp. at 2.)

On May 8, 2023, the City filed the instant Motion to Compel, in which it challenges NBC's application of the qualified reporter's privilege and seeks to compel production of a subset of the subpoenaed material, including all recordings and documents—aired or unaired—taken by NBC between 2017 and the present that contain statements from Ogrod, his agents and lawyers, and/or any witnesses. On May 22, 2023, NBC filed a Response to the Motion, requesting that we deny the Motion and quash the subpoena on the grounds that the demand for production both violates the qualified reporter's privilege, insofar as it seeks production of unaired materials, *and* subjects NBC to an undue burden, based on the full scope of the material it covers. NBC also requested, in the alternative, that we hold the Motion in abeyance "until after the various witnesses testify, the City attempts to meet its burden [to overcome the qualified reporter's privilege] on a more complete record, and the Court reviews [NBC's] unaired recordings and witness interviews *in camera*." (Resp. at 10.)

On June 1, 2023, the City filed a Reply, in which it withdrew the Motion to Compel with respect to (1) information from before 2018; (2) materials not generated for use in a story about Ogrod, his case, or the Horn murder; and (3) correspondence, excluding factual narratives of events about the case provided by Ogrod or his agents. Accordingly, those portions of the Motion to Compel are withdrawn and the City seeks to compel production of only (1) complete witness interviews, and (2) verbatim witness statements—aired or unaired—taken or created from 2018 to

the present and generated in connection with a story about Ogrod, his legal cases, or the Horn murder.

## II. LEGAL STANDARD

"As provided in [Federal] Rule [of Civil Procedure] 45, a nonparty may be compelled to produce documents and tangible things" pursuant to a subpoena duces tecum. Fed. R. Civ. P. 34(c); see also Fed. R. Civ. P. 45. Rule 45 provides, however, that a nonparty may object to a subpoena and refuse production. See Fed. R. Civ. P. 45(d)(2)(B). When an objection is raised, "[t]he subpoenaing party must first show that its requests are relevant to its claims or defenses, within the meaning of Federal Rule of Civil Procedure 26(b)(1)." In re Domestic Drywall Antitrust Litig., 300 F.R.D. 234, 239 (E.D. Pa. 2014) (citing Mycogen Plant Sci., Inc. v. Monsanto Co., 164 F.R.D. 623, 625-26 (E.D. Pa. 1996)). Once that showing is made, "the burden shifts to the subpoenaed nonparty who must show that disclosure of the information is protected under Rule 45(d)(3)(A) or (B)." Id. (citing Mycogen, 164 F.R.D. at 626). In relevant part, Rule 45(d)(3)(A) provides that disclosure cannot be compelled where the subpoena (1) "requires disclosure of privileged . . . matter, if no exception or waiver applies," or (2) "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A).

## III. DISCUSSION

The City seeks production of complete witness interviews and verbatim witness statements taken or created by NBC from 2018 to the present and generated in connection with a story about Ogrod, his legal cases, or the Horn murder. The City maintains that these witness interviews and statements are relevant to its defense in the underlying case because they concern the events that led to and followed Ogrod's allegedly coerced and fabricated confession to the Horn murder. NBC does not dispute that the requested materials are relevant to the City's defense. Rather, NBC

opposes the Motion on the grounds that disclosure of the requested materials is protected under Rule 45(d)(3)(A) because the request for production violates the qualified reporter's privilege and/or imposes an undue burden on NBC.

### A. The Qualified Reporter's Privilege

Insofar as the Motion seeks production of unaired recordings, NBC asserts that disclosure is protected by the qualified reporter's privilege. In Riley v. City of Chester, 612 F.2d 708 (3d Cir. 1979), the United States Court of Appeals for the Third Circuit first recognized "that journalists have a federal common law privilege, albeit qualified, to refuse to divulge their sources." Id. at 715. Since then, the Third Circuit has "extended the privilege beyond the protection of a confidential source to include the protection of a reporter's notes and other unpublished information, including unbroadcast portions of interviews." Doe v. Kohn Nast & Graf, P.C. ("Doe I"), 853 F. Supp. 147, 149 (E.D. Pa. 1994) (citing United States v. Cuthbertson, 630 F.2d 139, 146 (3d Cir. 1980)). The privilege stems from "the strong public policy supporting the unfettered communication to the public of information and opinion," and the recognition that "compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes." Cuthbertson, 630 F.2d at 146-47 (citation omitted).

"The privilege, however, is not absolute and must be weighed against the strong interest of litigants in the full and complete disclosure of relevant evidence." Doe I, 853 F. Supp. at 149 (citing Riley, 612 F.2d at 716). In determining whether the privilege applies, the court must therefore balance "the policies which give rise to the privilege and their applicability to the facts at hand against the need for the evidence sought to be obtained in the case." Id. (quoting Riley, 612 F.2d at 716). To this end, the Third Circuit, in Riley, "articulated a three-part test which a movant must satisfy in order to overcome a reporter's qualified privilege." Application of

Bloomberg, Civ. A. No. 97-227, 1998 WL 42252, at *2 (E.D. Pa. Jan. 8, 1998). The test requires that the party seeking disclosure show that (1) "he has made an effort to obtain the information from other sources," (2) "the only access to the information sought is through the journalist and her sources," and (3) "the information sought is crucial to the claim [or defense]." Doe I, 853 F. Supp. at 149 (quoting United States v. Criden, 633 F.2d 346, 358 (3d Cir. 1980)). Courts may also consider, "as an important factor favoring disclosure, the fact that the identity of the source of the information is not confidential."[1] Id. (citing Cuthbertson, 630 F.2d at 139).

"Ultimately, the decision on whether to order production of outtakes is extremely fact specific, and the court must examine the details of each case on an ad hoc basis." Id. (citing Riley, 612 F.2d at 715). In order to facilitate this fact-specific determination, a court may order in camera review of the requested materials, so long as the party seeking disclosure has shown that (1) "the information sought is unavailable elsewhere," and (2) the materials are relevant to the underlying case. Id. (citing Cuthbertson, 630 F.2d at 148).

Here, the City asserts that it has satisfied all three steps of the Riley test and, therefore, has overcome the qualified reporter's privilege. With respect to the first two steps, the City asserts

---

[1] Although the City asserts that it has met the three-part Riley test, it also maintains that it need not satisfy Riley because the test only applies where the movant seeks disclosure of confidential sources. The Third Circuit, however, has declined to develop a separate test for circumstances not involving confidential sources, and courts within the Third Circuit have therefore applied Riley where a party seeks disclosure of other, nonconfidential news material. See Cuthbertson, 630 F.2d at 147-48 (extending the qualified reporter's privilege beyond the confidential source context and declining to formulate a new test); Criden, 633 F.2d at 358 (recognizing the qualified reporter's privilege outside of the confidential source context, declining to formulate a new test, and applying Riley); Doe I, 853 F. Supp. at 149 (applying Riley outside of the confidential source context); In re Maykuth, Civ. A. No. 05-228, 2006 WL 724241, at *2 (E.D. Pa. Mar. 17, 2006) (same). We therefore apply Riley here but temper our application of the test on the grounds that the information sought does not concern a confidential source. See Criden, 633 F.2d at 358 (referring to the Riley test as "more stringent" when applied to the disclosure of confidential sources).

5

that it seeks interview recordings and witness statements which "cannot be replaced simply because a party could be interviewed (or deposed) separately." (City Mem. at 7 (citation omitted).) Witness statements, "[b]y their very nature, . . . are not obtainable from any other source" because "[t]hey are unique bits of evidence that are frozen at a particular place and time." Cuthbertson, 630 F.2d at 148. Even if the City could depose all of the witnesses interviewed by NBC in connection with a story about Ogrod, his legal cases, or the Horn murder, the City "would not obtain the particular statements" in NBC's possession, id., because "verbatim statements are unique" and "[t]he only source of this information is from the videotapes [or scripts] themselves." Doe I, 853 F. Supp. at 150. Moreover, a witness "cannot possibly be expected to remember or recite, at a later time, exactly what he said in prolonged interviews." Id. Accordingly, the City has shown that NBC is the only source of the witness interviews and statements it requests, and the City has therefore satisfied its burden at the first two Riley steps.

At the third step, we must consider whether the information sought is crucial to the City's defense. See Doe I, 853 F. Supp. at 149 (quoting Criden, 633 F.2d at 358). "The Court of Appeals has defined 'crucial to the claim [or defense]' in two ways: 'necessary for the development of the case' and 'going to the heart of the claim.'" In re Maykuth, Civ. A. No. 05-228, 2006 WL 724241, at *2 (E.D. Pa. Mar. 17, 2006) (quoting Riley, 612 F.2d at 717). With respect to the instant Motion, however, we may require the City to "prove less" in the way of cruciality because the materials it seeks are not confidential. Criden, 633 F.2d at 358 (venturing that the defendants "probably should be required to prove less" to obtain nonconfidential materials as opposed to the identity of a confidential source); see also Cuthbertson, 630 F.2d at 147 ("[T]he lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case.").

Here, the City asserts that the witness interviews and witness statements it seeks are "essential" to its case "both for impeachment and for the truth of the matters discussed" because "this case turns on probable cause, Plaintiff's innocence, and, in particular, what occurred in the interview room between Plaintiff and [the Defendant officers] that resulted in the confession." (City Mem. at 7.)  The City, however, has not explained, either in its briefing or at Oral Argument, how it intends to use the requested materials at trial to prove or disprove any of the issues it identifies.  Specifically, the City has suggested that it may use a statement from Ogrod to NBC as evidence at trial, but the City has failed to show that it has any reason to believe that Ogrod made an inconsistent statement to NBC or that a consistent statement will meaningfully develop its defense.  Moreover, the City has failed to identify any other witness whom it may impeach with a prior inconsistent statement to NBC.  Consequently, the City has failed to show how the requested materials might impact—for better or for worse—the "development of the case" or the "heart" of its defense.  Maykuth, 2006 WL 724241, at *2 (quoting Riley, 612 F.2d at 717).  Under these circumstances, we cannot conclude that the requested materials will be helpful or essential, let alone crucial, to the City's defense.

Nevertheless, based on a threshold showing of (1) the unavailability of the materials from other sources, and (2) relevance, we may order in camera review of the requested materials.  See Doe I, 853 F. Supp. at 149 (citing Cuthbertson, 630 F.2d at 148).  Here, we conclude that the City has made these threshold showings because (1) the City has satisfied the first two steps of Riley, which concern the unavailability of the materials from other sources, and (2) the materials relate to the underlying case and NBC does not dispute that they are relevant to the City's defense. At this stage, however, even in camera production of the requested materials appears premature because we have no foundation on which to judge the usefulness—let alone necessity—of the

7

requested materials. For example, in Doe v. Kohn, Nast & Graf, P.C. ("Doe II"), 853 F. Supp. 150 (E.D. Pa. 1994), the court granted in camera review of unaired video footage and thereafter compared the witness's statements in that footage with his statements at his deposition. See id. at 152. Based on that comparison, the court determined that "[n]othing on the tapes appear[ed] to be crucial to the defendants' case" because, even though the witness's "precise choice of words often differed on the various occasions he answered questions and told his story, the essence was the same throughout" and "his statements were consistent with each other and with his deposition testimony." Id. The court therefore denied the motion to compel. See id. Here, we cannot conduct a similar analysis because the City has failed to provide us with *any* deposition testimony to use for purposes of comparison. Therefore, even with the benefit of in camera review, we would have no basis to conclude that the requested materials are useful to the City's case.

Under these circumstances, we conclude that the qualified reporter's privilege applies to the unaired witness interviews and statements and that the City has failed to overcome the privilege at this stage. Therefore, we deny the City's Motion to the extent it seeks disclosure of those unaired materials.

      B.      Undue Burden

With respect to the remaining materials sought by the City's Motion, NBC asserts that disclosure will subject it to an undue burden. Where a party opposing production "asserts that disclosure would subject it to undue burden under Rule 45(d)(3)(A), it must show that disclosure will cause it a 'clearly defined and serious injury.'" In re Domestic Drywall, 300 F.R.D. at 239 (quoting City of St. Petersburg v. Total Containment, Inc., Misc. No. 07-191, 2008 WL 1995298, at *2 (E.D. Pa. May 5, 2008)) (citation omitted). Once that showing is made, the court "weighs the subpoenaing party's interest in disclosure and the subpoenaed nonparty's interest in non-

disclosure to determine whether the burden on the subpoenaed nonparty is, in fact, undue." Id. Specifically, the court considers factors such as "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." In re Auto. Refinishing Paint Antitrust Litig., 229 F.R.D. 482, 495 (E.D. Pa. 2005) (quotation omitted).

Here, NBC asserts that compliance with the Motion would require it to (1) "run term searches in [its] electronic archive of news videos and scripts, which would take hours of time by someone who is familiar with how the archive works;" and (2) assign a journalist to "watch each video and read each script returned by the searches to determine which videos (or parts of them) and scripts are responsive to the Subpoena" which "would take days of effort or more, depending on how many videos and scripts are returned by the searches." (O'Donnell Decl. ¶¶ 6-7.) NBC further asserts that this effort would "divert valuable company personnel and resources from regular business operations" and "significantly impede [its] journalists' ability to report the news and serve [its] viewers." (Id. ¶ 9.)

NBC, however, has failed to cite any case to support its position that this burden amounts to a "clearly defined and serious injury." Domestic Drywall, 300 F.R.D. at 239 (quoting City of St. Petersburg, 2008 WL 1995298, at *2) (citation omitted). Moreover, the City has now twice limited the scope of materials it requests in its Motion, in an effort to reduce the burden of production on NBC. First, in filing its Motion, the City narrowed its request for production to a subset of the subpoenaed materials, and again, in filing its Reply, the City further reduced the scope of its Motion. Based on the City's withdrawal of certain portions of its Motion, as well as our determination above that the qualified reporter's privilege applies to the City's request for unaired materials, NBC may only be required to produce *aired* witness interviews and statements

generated in connection with a story about Ogrod, his legal cases, or the Horn murder and taken between 2018 and the present—a span of five years.  NBC has not asserted that those witness interviews and statements are inaccessible.  In fact, in its March 28, 2023 letter, NBC indicated that it had already identified the published news reports covered by the subpoena and it could produce those published news reports upon payment of its standard administrative fee.  (See Mot. Ex. B.)  Under these circumstances, we find that NBC has failed to show that disclosure of the aired interviews and statements will subject it to a "clearly defined and serious injury."  Domestic Drywall, 300 F.R.D. at 239 (quoting City of St. Petersburg, 2008 WL 1995298, at *2) (citation omitted).  Accordingly, we conclude that disclosure of the aired materials covered by the City's Motion would not subject NBC to an undue burden, and we grant the City's Motion insofar as it seeks production of those aired materials.

## IV. CONCLUSION

For the foregoing reasons, the City's Motion to Compel is withdrawn in part, denied in part without prejudice, and granted in part.  The Motion is withdrawn insofar as it seeks to compel production of the following: (1) information from before 2018; (2) materials not generated for use in a story about Ogrod, his case, or the Horn murder; and (3) correspondence, with the exception of correspondence that includes a factual narrative of events about the case by Ogrod or his agents.  The Motion is denied without prejudice insofar as it seeks production of unaired news materials.  The Motion is granted insofar as it seeks aired witness interviews and witness statements taken from 2018 or later, which were generated in connection with a story about Ogrod, his legal cases, or the Horn murder.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____
John R. Padova, J.